Submitted January 31, reversed and remanded June 27, 2012

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JUAN CARLOS CRUZ-RENTERIA,
*Defendant-Appellant.*

Marion County Circuit Court
10C40453; A145766

280 P3d 1065

Peter Gartlan, Chief Defender, and Jedediah Peterson, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

John R. Kroger, Attorney General, Mary H. Williams, Solicitor General, and Leigh A. Salmon, Assistant Attorney General, filed the brief for respondent.

Before Armstrong, Presiding Judge, and Haselton, Chief Judge, and Duncan, Judge.

HASELTON, C. J.

## HASELTON, C. J.

Defendant, who was convicted following a conditional plea of guilty to one count of possession of heroin, ORS 475.854, and one count of possession of methamphetamine, ORS 475.894, appeals. He assigns error to the trial court's denial of his motion to suppress (1) physical evidence of methamphetamine possession, and derivative inculpatory statements, obtained after an officer elicited defendant's consent to remove an item from his pocket; and (2) evidence of heroin possession discovered during a subsequent booking inventory of items, including the contents of closed containers, in defendant's possession. We reject without published discussion defendant's challenge pertaining to the methamphetamine-related evidence, but, as explained below, we conclude that the inspection of the contents of the closed containers, two "canister vials," was not authorized by the applicable inventory policy and, thus, was unlawful. Consequently, because defendant's conditional guilty plea was predicated on a suppression ruling that was, in part, erroneous, we reverse and remand for further proceedings. *See, e.g., State v. Tannehill,* 341 Or 205, 210-12, 141 P3d 584 (2006); *State v. Dahlen,* 209 Or App 110, 146 P3d 359, *modified on recons,* 210 Or App 362, 149 P3d 1234 (2006).

The circumstances material to the discovery of the heroin-related evidence in the course of the booking inventory are undisputed. After defendant was arrested following the discovery of methamphetamine-related evidence on his person,[1] he was transported to the Marion County correctional facility. At that facility, a deputy responsible for intake saw that defendant had two "canister vials" hanging from his belt. Those canisters were "small metal cylinder[s] about the size of a lipstick tube, * * * half an inch in diameter, with a screw-on lid, fairly weather tight."[2] The deputy who was

---

[1] That evidence included "dime-size plastic baggies" with methamphetamine residue. Upon discovering the baggies, police handcuffed defendant and advised him of his *Miranda* rights, and the ensuing continuation of the search of defendant's person yielded a set of digital scales "commonly used for weighing narcotics" and two glass smoking pipes. Defendant admitted that he had used the baggies to hold his purchases of methamphetamine and had used the scales to confirm the amount of the methamphetamine purchased.

[2] The quoted description, replicating the intake deputy's testimony at the suppression hearing, was the only evidence presented to the trial court—and, thus, the

responsible for defendant's intake had never before seen such a container and believed that they "likely [could] contain a contraband item," including "a small amount of drugs, matches, [a] cigarette, [or a] sharp object." The deputy then opened the canisters, and the contents of one tested positively as heroin.

The deputy asserted and believed that, in opening the canisters and inspecting their contents, he was acting in accordance with Marion County Sheriff's Office Policy 3315, pertaining to "inmate personal property" (Policy 3315). That policy establishes "written guidelines for the receiving and storing [of] inmate personal property" and is intended to "ensure that all inmate personal property, including monies, is received, recorded, stored, and released in a safe, secure and systematic manner in accordance with the law." Under that policy, as pertinent here, "when taking custody of a prisoner's property for temporary storage," deputies engaged in the inmate booking/intake process are required (subject to certain exceptions) to

> "[o]pen closed containers *designed to typically carry* identification, cash, valuables, medications or contraband."[3]

(Emphasis added.) Unlike many other "designed to hold"-circumscribed inventory policies, Policy 3315 does not include any illustrative reference to examples of items encompassed within its scope.[4] All items of personal

only evidence in this record—as to the canisters' appearance and function. The canisters themselves were not admitted as exhibits or otherwise proffered for the trial court's inspection.

[3] It appears that that language may be the product of our analysis and holding in *State v. Guerrero*, 214 Or App 14, 162 P3d 1048 (2007), in which we addressed what appears to have been an antecedent "Marion County Sheriff's department's inmate personal property policy," *id.* at 16, which did not "discuss[ ] what to do with closed containers or expressly authorize[ ] a deputy to open a closed container for any purpose," *id.* at 17. In light of the policy's silence in that regard, we held that the opening and inspection, during the booking/intake process, of a closed leather case (marked "Panasonic light scope") in the defendant's possession was unlawful. *Id.* at 22-23.

[4] *See, e.g., State v. Keady*, 236 Or App 530, 532, 237 P3d 885 (2010) (addressing City of Salem inventory policy requiring opening of closed containers "that are designed to hold valuables, including backpacks, fanny packs, briefcases, [and] purses"); *State v. Swanson*, 187 Or App 477, 480, 68 P3d 265 (2003) (addressing application of Tigard Municipal Inventory Policy providing that "[p]urses, wallets, fanny packs, backpacks, and other similar items designed to contain valuables shall be opened and their contents shall be inventoried").

property, including but not limited to valuables, must be taken from the inmate, listed on an inventory form, and safely stored.

After being charged with one count of possession of methamphetamine and one count of possession of heroin, defendant, as noted, moved to suppress, *inter alia*, the heroin found in the one "canister/vial." He argued, in part, that the opening and inspection of the contents of the canisters exceeded the authorized scope of the inventory policy because the canisters were not items—akin to purses, wallets, or suitcases—that were "designed to typically carry" valuables or contraband. The trial court denied suppression, reasoning that, because "[t]he vials opened at the jail were of a type that *could contain* contraband" (emphasis added), the "search of the vials was legal."[5]

Defendant then entered into a conditional plea of guilty to both of the charged offenses. The addendum to the plea petition specified that the purpose of the conditional plea was "to reserve the defendant's right of review of the trial court's denial of his Motion to Suppress." Thus, the conditional plea was an integrated whole—it did not purport to differentiate between the two charges and to condition the plea as to either of those charges on the ultimate appellate outcome with respect to the suppression of evidence relating only to that charge.

On appeal, defendant's argument as to the heroin-related evidence is unadorned: (1) Policy 3315, by its terms, authorizes the opening only of those "closed containers [that are] *designed to typically carry* identification, cash, valuables, medications or contraband" (emphasis added); and (2) although the trial court found that the canisters "*could contain* contraband" (emphasis added), "designed to typically

---

Policy 3315 does, however, include a definition of "closed containers" generally: "Carrier[s] or holder[s] whose contents are not exposed to view."

[5] The trial court's "could contain" determination was, and is, effectively a *non sequitur* in that it did not address the operative "designed to typically carry" standard. In many cases, the trial court's failure to make such an essential determination would necessitate a remand. Here, however, the predicate facts pertaining to the canisters' characteristics are uncontroverted, *see* 250 Or App at 586-87, and, for reasons that will become apparent shortly, a remand for reconsideration is inapposite.

carry" and "could contain" are qualitatively different concepts—and the record adduced at the suppression hearing does not permit a determination that the canisters satisfied the former, and expressly applicable, standard. The state responds that the opening and inspection of the contents of the canisters was authorized under Policy 3315 because the totality of the circumstances, viewed objectively, demonstrates that a reasonable person "could expect to find valuables in metal containers with weather-tight, screw-on lids that are physically attached to a person's belt." (Emphasis and internal quotation marks omitted.)

We note, at the outset, that the issue presented in this case is materially distinct from that presented in *State v. Cordova*, 250 Or App 397, 280 P3d 1036 (2012), and *State v. Taylor*, 250 Or App 90, 279 P3d 254 (2012), both of which we decided very recently. In *Cordova*, the issue was whether the applicable provision of the inventory policy, which purported to authorize the opening and inspection of the contents of "[a]ll closed containers that could contain valuables," 250 Or App at 399, was unconstitutionally overbroad. There was no question that, if that provision were constitutionally valid, the items opened and inspected—a small safe and a can with a false bottom, which was found in the safe—were within the scope of that provision. We concluded that the inventory provision was, by its terms, impermissibly overbroad because, given that "any closed container *could*, regardless of *objective likelihood*, contain valuables * * * the policy, as a practical matter, necessarily requires officers to open and inspect the contents of every opaque closed container." *Id.* (emphasis in original).

In *Taylor*, we reversed the trial court's determination that the contents of a closed cigarette box that the police had seized from the defendant's pocket and searched at the time of his arrest would inevitably have been lawfully discovered pursuant to a subsequent jailhouse booking inventory. In so holding, we concluded that the purportedly applicable inventory provision was unconstitutional as overbroad in that it was "not, in fact, limited to opening only those containers that are objectively likely to contain contraband[,]" but, instead, required an officer "to search property that he or she 'deem[s] appropriate,' without regard to whether the search

will further the security of the facility." 250 Or App at 98. We further concluded that the policy was defective "because it contains no complete and meaningful limitation on the scope of the inventory" and, thus, "effectively authorizes a search of all property, including any closed container, regardless of what the container is objectively likely to hold." *Id.*

Here, in contrast, the pivotal question is not whether the terms of Policy 3315 are unconstitutionally overbroad or permit some impermissible exercise of officer discretion. Rather, the issue is whether the canisters fell within the scope of the policy's mandate—*viz.*, whether the canisters were "closed containers designed to typically carry identification, cash, valuables, medications or contraband." *Accord, e.g., Keady,* 236 Or App at 534 (noting and emphasizing distinction between items "designed to contain valuables" and those that are "often used to hold valuables" for purposes of applying inventory policy that authorized inspection of the former but not the latter (emphasis omitted)); *State v. Swanson,* 187 Or App 477, 484-85, 68 P3d 265 (2003) (same).

In resolving that question, we note that this case is unlike most involving the application of a "designed to hold" or "designed to carry" inventory provision. That is so both because of the content of the operative provision here and because of the character of the closed containers at issue here. With respect to the content of the policy, this is—we believe—the first time that the court has encountered a provision requiring an inventory of closed containers "designed to *typically* carry" various items. (Emphasis added.) The significance of the additional adverb is inscrutable, in that, as a practical matter, appellate decisions construing and applying "designed to carry" (or "to hold") inventory provisions have, effectively, understood them to incorporate a "typically" limitation. *See, e.g., State v. Bean,* 150 Or App 223, 226 n 4, 229, 946 P2d 292 (1997), *rev den,* 327 Or 448 (1998) (inventory of contents of fanny pack was lawful under policy mandating inventory of closed containers "designed for carrying money and/or small valuables on or about the person"). Without such an implicit limitation—if, for example, "designed to hold" provisions could be understood as "designed to *potentially* hold"—then, because virtually any closed container

*could* hold valuables or contraband, the policy would be impermissibly overbroad. *See, e.g., Cordova*, 250 Or App at 402-04.[6]

The containers at issue—the canisters—are also atypical. Many of our "designed to carry"/"designed to hold" precedents involved either: (1) containers that are classically designed to hold valuables, in that that is their manifest primary purpose—*e.g.*, fanny packs (*Bean*, 150 Or App at 229);[7] or (2) more frequently, containers that are designed to contain items other than valuables or species of contraband—*e.g.*, a "fish oil capsule container" (*Keady*, 236 Or App at 534 (internal quotation marks omitted)) or a matchbox (*State v. Maynard*, 149 Or App 293, 295, 942 P2d 851 (1997), *rev den*, 327 Or 448 (1998)). Here, however—at least on this record—the canisters did not fall within either of those self-evident categories. Rather, given the limited evidence adduced during the suppression hearing, a reasonable person could not say, with any degree of confidence, what the canisters were, or were not, designed to hold. Certainly, they *could contain or carry* valuables or medications or contraband—but that is hardly dispositive, and could well be immaterial, to the "designed to typically carry" standard. Further, to the extent that reasonable people—*e.g.*, officers charged with implementing Policy 3315—could differ in their understanding as to the canisters' intended/"designed to" purpose, that could

---

[6] It is possible that the inclusion of "typically" was intended to import a further, and disjunctive, basis for conducting an inventory of a closed container—*viz.*, that the container is "objectively *likely to contain*" valuables and contraband. *Guerrero*, 214 Or App at 22 (emphasis added); *see State v. Williams*, 227 Or App 453, 457, 206 P3d 269 (2009) ("An inventory policy may * * * authorize opening containers that are designed to or likely to contain items of value." (citing *Guerrero*, 214 Or App at 19-20)). Indeed, the intake deputy's testimony at the suppression hearing in this case spoke to *that* standard—*viz.*, that the canisters here "likely [could] contain a contraband item." 250 Or App at 587.

Whatever the unexpressed intent, however, the text of Policy 3315—"closed containers *designed* to typically carry" (emphasis added)—is not plausibly susceptible to such a construction. As a matter of fundamental grammar—and plain English—"designed to typically carry" is an adjectival phrase modifying the object "closed container," and the prepositional phrase "to typically carry" in turn modifies "designed." "[T]ypically carry" does not describe an independently sufficient basis for an inventory under Policy 3315.

[7] *Accord State v. Mundt/Fincher*, 98 Or App 407, 412, 780 P2d 234, *rev den*, 308 Or 660 (1989) (purses and wallets are "uniquely designed" for the purpose of holding "valuable property").

implicate impermissible discretion, notwithstanding the policy's (at least ostensibly) objective constraints.

Not surprisingly, none of our precedents is precisely analogous, but *Swanson* is most similar. In *Swanson,* we addressed whether, in opening and inspecting the contents of a "purse accessory kit," an officer had exceeded the scope of an inventory policy's mandate that "[p]urses, wallets, fanny packs, backpacks, and other similar items designed to contain valuables shall be opened and their contents shall be inventoried." 187 Or App at 479-80. In considering that question, we noted that the officer who had conducted the inventory "did not testify that the * * * container appeared to be *designed* for carrying valuables or even that he expected to find valuables when he opened the container" and that when he had "come into contact with those type of containers before * * * he [had] found both valuable and nonvaluable items in them." *Id.* at 484 (emphasis in original). With respect to the latter testimony, we observed that the fact that the officer "had previously found both valuable and nonvaluable items in the type of container at issue * * * says little, by itself, about what the container was *designed* to carry." *Id.* (emphasis in original). We further emphasized that the officer "did not testify that the container was, or appeared to be, similar to a wallet, purse, coin purse, briefcase, fanny pack, backpack, or other item designed to contain valuables." *Id.* Ultimately, we concluded:

> "The trial court's conclusion, apparently based on the judge's personal understanding that women often do use such containers to carry valuables, begs the essential question of whether the container was designed to do so. Without out the container in evidence and based solely on [the officer's] description of it, the trial court lacked a basis for making an implicit finding that the container was 'designed to contain valuables.' "

*Id.* at 484-85.

We return to the uncontroverted facts of this case. Here, as in *Swanson,* the containers at issue are not in evidence, and the deputy who conducted the inventory did not testify that the canisters were "designed to carry" valuables or contraband. Neither in itself is necessarily dispositive

because, at least in some instances, the purposes for which a container was designed can be circumstantially inferred from, *inter alia,* structural features of the item. For example, even if there was no testimony that a purse or wallet or coin purse was designed to carry—or "typically carry"—currency or valuables, a court, in resolving a motion to suppress, could certainly so determine. Here, however, there is no evidence that the canisters shared structural features with closed containers commonly and consistently deemed to be "designed to carry" identification, cash, valuables, medications, or contraband. Nor is there any evidence that the canisters had features discretely, even if not uniquely, related to such a purpose. To be sure, the canisters were durable and closed tightly—but the same could be said of myriad, generic closed containers. Further—and strikingly—the deputy candidly acknowledged that, in the course of his work as a booking officer, he had never before seen a similar container, and, except for referring to the canisters as being "about the size of a lipstick tube," the deputy did not attempt to compare or analogize the canisters to any other containers, much less those designed to carry valuables or contraband.

In sum, and consistently with *Swanson,* the record developed at the suppression hearing was inadequate to establish that the canisters at issue here were "closed containers designed to typically carry identification, cash, valuables, medications or contraband." Further, even if the record could somehow permit reasonable implementing officers to draw differing inferences as to an "ambiguous" closed container's "designed to" purpose, to sustain the inspection of the contents of such an object would interject individual variability and impermissible discretion into the policy's application. *See, e.g., State v. Atkinson,* 298 Or 1, 10, 688 P2d 832 (1984) (to be lawful, inventory "must be conducted pursuant to a properly authorized administrative program, designed and systematically administered *so that the inventory involves no exercise of discretion by the law enforcement person directing or taking the inventory*" (emphasis added)). Thus, the trial court erred in concluding that the invasion of the canisters—and, specifically, the canister containing the heroin-related evidence—was pursuant to a lawful inventory and in denying suppression of that evidence.

We turn, finally, to the proper disposition, which is dictated by ORS 135.335(3),[8] as construed in *Tannehill*. In *Tannehill*, the defendant was charged with three counts of third-degree sexual abuse and one count of witness tampering. He filed an unsuccessful motion to dismiss the three sexual abuse counts as having not been commenced within the applicable statute of limitations, and, after the trial court denied that motion, the defendant entered a conditional guilty plea, pursuant to ORS 135.335(3), to one count of third-degree sexual abuse and one count of witness tampering. 341 Or at 207-08. On appeal, the defendant did not challenge his conviction for witness tampering but did contend that the trial court had erred in holding that the prosecution for third-degree sexual abuse was not time-barred. *Id.* The Supreme Court agreed with the defendant's argument as to the statute of limitations, *id.* at 208-10, and then addressed the proper disposition in light of the defendant's conditional guilty plea. In particular, the court determined that the defendant was entitled under ORS 135.335(3), if he so chose, to withdraw "the entire plea rather than only part of it." *Id.* at 210-11. Accordingly, rather than reversing and remanding only with respect to the conviction for third-degree sexual abuse and affirming the conviction for witness tampering, the Supreme Court remanded the entire case to the circuit court "for further proceedings."

*Tannehill* is dispositive here. Although we have affirmed the trial court's suppression ruling with respect to the evidence on which defendant's conviction for possession of methamphetamine was based, we have also reversed the trial court's suppression ruling with respect to the heroin-related evidence. As noted, *see* 250 Or App at 588, the conditional plea agreement did not differentiate between those two matters; that is, the conditional plea as to either of those charges was not predicated on the ultimate appellate outcome with respect to the suppression of evidence relating

---

[8] ORS 135.335(3) provides:

"With the consent of the court and the state, a defendant may enter a conditional plea of guilty or no contest reserving, in writing, the right, on appeal from the judgment, to a review of an adverse determination of any specified pretrial motion. A defendant who finally prevails on appeal may withdraw the plea."

only to that charge. Because the conditional plea agreement here was, as it was in *Tannehill*, an integrated whole, the same disposition must obtain.

Reversed and remanded.