Argued and submitted February 19, convictions on Counts 3 through 8 reversed
and remanded; remanded for resentencing; otherwise affirmed
November 27, 2013

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

CLAUDINE STEWART,
*Defendant-Appellant.*

Multnomah County Circuit Court
091235109; A146652

314 P3d 966

David O. Ferry, Deputy Public Defender, argued the cause
for appellant. With him on the brief was Peter Gartlan, Chief
Defender, Office of Public Defense Services.

Tiffany Keast, Assistant Attorney General, argued the
cause for respondent. With her on the brief were John R.
Kroger, Attorney General, and Anna M Joyce, Solicitor
General.

Before Schuman, Presiding Judge, and Wollheim, Judge,
and Duncan, Judge.

DUNCAN, J.

**DUNCAN, J.**

This is a criminal appeal in which defendant challenges her convictions for six counts of theft in the first degree, ORS 164.055 (Counts 1, 3, 5, 7, 42, and 43); four counts of making a false claim for health care payment, ORS 165.692 (Counts 2, 4, 6, and 8); two counts of unlawfully obtaining a food stamp benefit, ORS 411.840 (Counts 40 and 41); and one count of tax evasion, ORS 314.075 (Count 45). Defendant assigns error to the trial court's failure to enter a judgment of acquittal on each of those counts, arguing that the state introduced insufficient evidence to prove that defendant committed those crimes. We conclude, based on the evidence in the record, that no rational factfinder could reasonably find that the state proved the elements of Counts 3 through 8 beyond a reasonable doubt. However, a rational factfinder could reasonably find that the state proved the elements of Counts 1, 2, 40 through 43, and 45 beyond a reasonable doubt. We therefore reverse and remand Counts 3 through 8 for a new trial, remand the case for resentencing, and otherwise affirm.

We state the evidence in the light most favorable to the state. *State v. Hall*, 327 Or 568, 570, 966 P2d 208 (1998); *State v. Bell*, 220 Or App 266, 268, 185 P3d 541 (2008). For the sake of clarity, we present the facts in roughly chronological order. The facts, which are numerous, relate to the state's allegations that defendant (1) aided and abetted her husband and sister in a scheme to obtain health care payments to which they were not entitled, (2) received food stamp benefits to which she was not entitled, and (3) falsely claimed her nephew as a dependent on a tax return.

From at least December 2005 to June 2009, defendant was married to and living with codefendant Harvey Gaither. The State of Oregon paid a home care provider, Francine DeWeese—defendant's sister—to care for Gaither during that time period. Gaither represented that he needed assistance because he had a severe essential tremor due to Parkinson's disease. At trial, the state did not dispute that, for many years, Gaither had had a severe essential tremor that impaired his fine motor skills; rather, the state asserted, Gaither had exaggerated the severity of the tremor and his resulting impairment.

Mesirow, Gaither's case manager since 2005, conducted an assessment each December to determine the level of care that the state would support. Mesirow testified that she was required to conduct an assessment in the event of a significant medical change, or at least once a year, if no significant medical change occurred. Those assessments, which were attended by Mesirow, Gaither, and DeWeese, were largely based on Gaither's self-reports. After each assessment, Mesirow prepared a detailed report of Gaither's needs, as well as a synopsis called a "Client Plan," which she sent to Gaither for his signature. Gaither and Mesirow were the only two individuals who were required to sign the client plans, although DeWeese signed some of the plans and defendant signed one of the plans. Based on the assessments, Mesirow authorized a monthly number of hours for which the state would pay DeWeese. Defendant did not attend any assessments, sign any payment vouchers, or receive any home health care payments.

Of the five client plans that Mesirow prepared for Gaither, defendant signed only the 2005 client plan, which was based on a December 12, 2005, assessment. Defendant was not present at the assessment. Defendant signed the plan on December 14, 2005, as did Gaither, DeWeese, and Mesirow. The 2005 client plan, a printed form on which certain columns were marked, stated that Gaither "agrees to have assistance" with the following areas at least once a day: adaptation to change, meals, ambulation, danger to self, demands on others, eating, memory, toileting, and transfers. The 2005 client plan also stated that Gaither "agrees to have assistance" with dressing, grooming, and hygiene "[e]ach time." The 2005 client plan had an anticipated "review date" of December 31, 2006. Mesirow's next assessment of Gaither occurred on December 21, 2006, and Gaither signed the associated client plan on January 4, 2007.

In addition to paying DeWeese to care for Gaither, the state also paid DeWeese to care for children, including defendant's children. The state introduced vouchers showing that, between January 1, 2006 and February 28, 2009, the state paid DeWeese to care for children other than defendant's children. The mother of one of those children testified that she dropped her daughter off at DeWeese's apartment

in the morning and picked her up in the afternoon from various locations, most frequently DeWeese's house or defendant's house.

Defendant and Gaither applied for food stamp benefits on November 29, 2007. Defendant and Gaither both signed the application, as was required. They attached three receipts to the 2007 application, indicating monthly payments of $400 to DeWeese for child care in August, September, and October 2007. The state set defendant and Gaither's monthly food stamp benefit level at $149 in December 2007.

In late 2007, defendant and Gaither applied to be foster parents through the Albertina Kerr Center. The application form, dated November 5, 2007, lists four individuals living in the home: defendant, Gaither, and defendant's two children, a 12-year-old daughter and a 10-year-old son. On December 27, a foster parent recruiter visited defendant and Gaither in their home for the first time. During that visit, defendant and Gaither told the recruiter that Gaither received disability payments due to "a hereditary condition called actinovosa which creates so much adrenaline, fine motor skills are lost." The recruiter observed Gaither's tremor, but she was not aware that he had a paid home health care worker. The recruiter was introduced to defendant's two children.

In March 2008, the recruiter again visited defendant and Gaither in their home. The recruiter did not observe Gaither experience any difficulty walking. The recruiter believed that Gaither would be the primary caregiver for any foster children. She also believed that he was able to drive.

On June 22, 2008, defendant and Gaither successfully completed a foster parent training that required them to practice physical restraint holds. The trainer noticed that Gaither had "a bit of a hand tremor" but "didn't think that it would be hugely detrimental to their ability to be foster parents" and "didn't feel concerned about it." The trainer observed that, despite the tremor, Gaither was able to drink coffee from a paper cup without assistance.

Also, at some point during June 2008, defendant called Mesirow to report that Gaither was experiencing greater difficulty swallowing and was going to be tested to try to determine the cause. Mesirow testified, "[Defendant] was asking for increased hours for the home care worker if it was needed for this week as she was working. And I just requested that [defendant] call me back today with an update as to the outcome of the testing * * *." Defendant did not call back with an update, and Mesirow did not increase the hours authorized for DeWeese.

At a meeting on July 28, 2008, defendant and Gaither told a foster care social worker that defendant's children, who were then 13 and 11 years old, would be living in the home. At the time, defendant's nephew, whom defendant later claimed as a dependent on the 2008 tax return that she and Gaither filed, was about four years old. A foster child, a 15-year-old boy, was placed with defendant and Gaither in August 2008. From August 2008 through June 2009, defendant and Gaither received state funds to care for that foster child.

On August 17, 2008, defendant and Gaither performed a fire drill required by Albertina Kerr Center. Defendant reported that she, Gaither, her two children, and the foster child were present in the home during the drill. Six more fire drills occurred between that date and March 2009; the only children that defendant reported as present for the drills were her two children and the foster child. Each fire drill report states that each person in the house evacuated the house in two and one-half minutes or less.

From August to December 2008, defendant signed foster parent daily log notes stating that Gaither performed such tasks as walking to the store, cleaning the yard, and taking the foster child to appointments.

Defendant and Gaither reapplied for food stamp benefits on October 22, 2008, using an application that they both signed. They attached three receipts to the 2008 application showing that defendant had made monthly payments of $700 to DeWeese for child care in September, October, and November 2008. The state set defendant and Gaither's monthly food stamp benefit level at $400.37 in November 2008.

On December 12, 2008, Mesirow observed Gaither shopping unassisted in the grocery store, which prompted an investigation of the home health care payments and other government assistance that Gaither, DeWeese, and defendant had received. Vickie Shaffer, an investigator for the Medicaid Fraud Unit at the Oregon Department of Justice, conducted intermittent surveillance of Gaither and DeWeese from January 2009 through April 2009.

On January 13, 2009, Gaither was cited for driving without a valid license. Gaither called defendant, who picked him up.

On January 15, 2009, Shaffer arrived at defendant and Gaither's house at 6:48 a.m. There were no vehicles outside the house. Approximately one hour later, Shaffer drove to DeWeese's house, where she arrived at 8:05 a.m. The vehicle registered to DeWeese was not present. Shaffer immediately returned to defendant and Gaither's house, where she arrived at 8:24 a.m. DeWeese's vehicle was not present at defendant and Gaither's house.

On February 2, 2009, defendant and Gaither met with a tax preparer to prepare their 2008 tax return. Defendant and Gaither told the tax preparer that three children—defendant's two children and her nephew—had resided in the home for more than seven months during 2008. On defendant and Gaither's 2008 tax return, which they filed jointly, defendant claimed exemptions for herself and Gaither, as well as her two children and her nephew.

On February 3, 2009, at 8:23 a.m., Shaffer observed DeWeese's car parked at her house. Shaffer then drove to defendant and Gaither's house. From 8:57 a.m. to 11:54 a.m., and from 12:02 p.m. to 3:15 p.m., Shaffer observed that there were no vehicles at defendant and Gaither's house. Shaffer drove to DeWeese's house at 3:47 p.m. and observed that DeWeese's car was parked in front of the house.

In early 2009, at the request of the food stamps quality assurance team, Mesirow asked defendant and Gaither to explain why 11- and 13-year-old children needed child care. In response, defendant wrote a letter "To whom it [may]

Concern," which was delivered to Mesirow on February 6, 2009, when she was conducting an in-home assessment of Gaither. The letter explained that defendant's neighborhood is dangerous and that the children need care before and after school to ensure that they make it safely onto the bus in the morning and arrive home in the afternoon. The letter stated, "I requested Francine DeWeese to be here at 5:00 AM when I leave for work, [to] make sure the kids get on the bus, then she assist[s] my husband with [his] daily needs * * * also she would make sure my kids get safely in the house until I arrived."

On February 5, 2009, a day before Mesirow was scheduled to do an in-home assessment of Gaither, Shaffer observed that DeWeese's car was parked in front of her house from 7:12 a.m. to 12:15 p.m., at which point DeWeese got into the car and drove to defendant and Gaither's house. From 12:44 p.m. to 3:15 p.m., DeWeese was at defendant and Gaither's house. At 3:15 p.m., a teenage girl walked up to the front porch. DeWeese came outside and had a conversation with her. DeWeese then left in her car, and the girl went in the house.

On February 6, 2009, Mesirow conducted the scheduled in-home assessment of Gaither. Shaffer was also present. When Mesirow and Shaffer arrived at defendant and Gaither's house at 9:35 a.m., DeWeese was present.

On February 19, 2009, an employee from Albertina Kerr Center visited defendant and Gaither at home. Gaither showed the employee around the house, including the garage and the second floor. In March 2009, two more foster children were placed in defendant and Gaither's home.

On April 30, 2009, the state sent defendant an interim change report as part of a six-month review of the food stamp benefits. On May 19, defendant provided a letter indicating that the child care had ceased, that her rent had changed, and that she and Gaither had become foster parents. Due to those changes, defendant and Gaither were no longer eligible for food stamp benefits. In June 2009, Gaither reported that he had moved out of the house because he and defendant were separated. All subsequent applications for food stamp benefits were made by Gaither alone.

Defendant was ultimately indicted on 15 counts of theft in the first degree, 19 counts of making a false claim for health care payment, two counts of unlawfully obtaining a food stamp benefit, and two counts of tax evasion. Defendant waived the right to a jury trial, and she was tried jointly with Gaither, DeWeese, and Gaither's niece.

At trial, the state asserted that defendant had aided and abetted Gaither and DeWeese in committing theft and making a false claim for health care payment. In support of that theory, the state pointed to several pieces of evidence. First, the state argued that defendant's signature on the 2005 client plan indicated that she knew that Gaither and DeWeese were claiming that Gaither needed all-day, extensive care. Additionally, the state argued that defendant's call to Mesirow in June 2008 regarding Gaither's swallowing issues demonstrated that defendant was aware of, and assisted in, Gaither and DeWeese's exaggeration of Gaither's disability in order to obtain health care payments. The state also highlighted defendant's February 5, 2009, letter to Mesirow, which stated that, after DeWeese ensured that the children got on the bus, she helped Gaither "with [his] daily needs." In addition, the state pointed to various meetings between Albertina Kerr Center employees, defendant, and Gaither, in which Gaither's only disability appeared to be a hand tremor. The state also argued that the fire drill logs and foster parent daily log notes, signed by defendant, indicated that defendant knew that Gaither was able to evacuate the house in less than two and a half minutes and perform activities such as walking to the store and cleaning the yard.

In response, defendant argued that, because she did not sign any payment vouchers or receive any health care payments, the state did not present sufficient evidence to show that she aided or abetted Gaither and DeWeese in committing theft and making a false claim for health care payment. In addition, defendant argued that, because she lacked medical training, she could not reasonably have known whether Gaither was exaggerating the severity of his disability. Although defendant conceded that she signed the 2005 client plan, she pointed out that she was not present during the assessment on which it was based. Defendant also argued that, because her June 2008 phone call to Mesirow

resulted in no change in the number of hours of care that Gaither was authorized to receive, that phone call was not evidence that defendant was aiding or abetting a scheme to inflate those hours.

At trial, the state also asserted that defendant was directly liable for unlawfully obtaining a food stamp benefit. The state presented two theories as to how defendant unlawfully obtained a food stamp benefit. First, the state argued, defendant overstated her expenses on the 2007 and 2008 food stamp applications by claiming that she was paying DeWeese to care for defendant's children when DeWeese was actually caring for other people's children in DeWeese's own home. Second, the state argued, defendant understated her income on the 2008 food stamp application by omitting the foster child income, which she had begun to receive two months before filing the 2008 food stamp application. Defendant did not report the foster child income until nine months after she began receiving that income.

In response, defendant argued that the evidence showed that she did, in fact, pay DeWeese to perform child care, regardless of whether DeWeese was actually performing that child care. Thus, defendant properly included that expense on the 2007 and 2008 food stamp applications. Additionally, defendant argued that, because it was not clear whether the foster child would remain permanently in defendant's home, the foster child income was not predictable, and it was reasonable for defendant to omit it from the food stamp application. Moreover, defendant noted, the food stamp application form did not specifically ask about foster child income. Thus, argued defendant, the state failed to present evidence that defendant knowingly obtained food stamp benefits that she was not entitled to receive.

Finally, the state asserted that defendant was directly liable for income tax evasion. According to the state, defendant committed tax evasion by falsely claiming her nephew as a dependent on her 2008 tax return, even though none of the foster care reports from that period indicated that the nephew was living in the home. In response, defendant argued that the state failed to present any evidence that defendant's nephew was *not* living with defendant for more than half of 2008, as required to claim a child as a dependent.

The trial court convicted defendant of six counts of theft in the first degree (Counts 1, 3, 5, 7, 42, and 43); four counts of making a false claim for health care payment (Counts 2, 4, 6, and 8); two counts of unlawfully obtaining a food stamp benefit (Counts 40 and 41); and one count of tax evasion (Count 45). Defendant appeals those convictions, asserting that the state failed to present sufficient evidence to allow the trial court to convict her of any of the charges.

"In reviewing the denial of a motion for judgment of acquittal, we determine whether, after viewing the facts in the light most favorable to the state, the record contains evidence from which a rational trier of fact could have found that the essential elements of the charged offenses were proved beyond a reasonable doubt."

*State v. Mather*, 256 Or App 230, 231, 300 P3d 225 (2013); *see also State v. Cunningham*, 320 Or 47, 63, 880 P2d 431 (1994). In establishing those elements, the state may rely on circumstantial evidence and reasonable inferences flowing from that evidence. *State v. Bivins*, 191 Or App 460, 466, 83 P3d 379 (2004). An inference is not reasonable if it "requires too much stacking of inferences and, ultimately, too great an inferential leap." *Id.* at 470. Although the line between permissible inferences and impermissible speculation can be difficult to articulate,

"'[it] is not drawn by judicial idiosyncrasies. The line is drawn by the laws of logic. If there is an experience of logical probability that an ultimate fact will follow a stated narrative or historical fact, then the jury is given the opportunity to draw a conclusion because there is a reasonable probability that the conclusion flows from the proven facts.'"

*Id.* at 467 (quoting *Tose v. First Pennsylvania Bank, N.A.*, 648 F2d 879, 895 (3d Cir), *cert den*, 454 US 893 (1981)).

We begin by addressing Counts 1 through 8, which consist of paired charges for first-degree theft and making a false claim for health care payment. Each pair of charges is based on a two-month period; for instance, Count 1 alleges first-degree theft during January and February 2009, and Count 2 alleges making a false claim for health care payment during the same time period. Counts 1 through 8 cover the period of time between July 1, 2008 and February 28, 2009.

On appeal, defendant asserts that the state failed to present evidence that she was aware of Gaither and DeWeese's scheme to exaggerate Gaither's disability in order to obtain provider payments for DeWeese. With respect to the 2005 client plan, defendant argues that, at most, it supports "an inference that defendant knew that the state had agreed that Gaither was disabled and would benefit from assistance in numerous areas" and that it does not support an inference that defendant intended to aid Gaither's deception. With respect to defendant's 2008 phone call to Mesirow, defendant argues that the state did not present any evidence to contradict defendant's statements that Gaither was having difficulty swallowing and was going to be tested to try to determine the cause. Thus, according to defendant, the phone call supports an inference that defendant knew that Gaither was receiving benefits, but does not provide any basis to believe that she knew that he was lying to receive unnecessary care. Moreover, argues defendant, the fact that she did not call back after the testing supports an inference that she was not participating in requests for unnecessary services. Finally, with respect to the 2009 letter, defendant argues that it

"indicates a general awareness that DeWeese provides assistance to Gaither during the day, but supports no further inference regarding their misrepresentations. The letter could also support a further inference that [defendant] would rather have her sister care for her children than Gaither, and was willing to pay for it, but, again, that does not indicate participation in Gaither and DeWeese's provider scheme."

In addition, defendant asserts that, because she wrote the letter in response to questions regarding her eligibility for food stamps, it is not reasonable to infer that the letter was intended to aid Gaither in unlawfully obtaining health care payments.

In response, the state argues that defendant's signature on the 2005 client plan, alone, is sufficient to support a reasonable inference that, with the intent to promote or facilitate the scheme, defendant aided, abetted, or agreed or attempted to aid or abet Gaither or DeWeese in planning or committing those crimes. For the reasons explained below,

we conclude that the evidence the state presented does not support a reasonable inference that defendant aided, abetted, or agreed or attempted to aid or abet Gaither or DeWeese in planning or committing of the thefts and false claims for health care payments alleged in Counts 3 through 8. On the other hand, the evidence does support a reasonable inference that defendant aided, abetted, or agreed or attempted to aid or abet Gaither or DeWeese in planning or committing the thefts and false claims for health care payments alleged in Counts 1 and 2.

At the time of the charged thefts, ORS 164.055 (2007) provided, as pertinent here:

"(1)  A person commits the crime of theft in the first degree if, by other than extortion, the person commits theft as defined in ORS 164.015 and:

"(a)  The total value of the property in a single or aggregate transaction is $200 or more in a case of theft by receiving, and $750 or more in any other case[.]"[1]

ORS 164.015, in turn, provides:

"A person commits theft when, with intent to deprive another of property or to appropriate property to the person or to a third person, the person:

"(1)  Takes, appropriates, obtains or withholds such property from an owner thereof[.]"

ORS 165.692, which defines the crime of making a false claim for health care payment, provides:

"A person commits the crime of making a false claim for health care payment when the person:

"(1)  Knowingly makes or causes to be made a claim for health care payment that contains any false statement or false representation of a material fact in order to receive a health care payment; or

"(2)  Knowingly conceals from or fails to disclose to a health care payor the occurrence of any event or the existence of any information with the intent to obtain a health care payment to which the person is not entitled, or to obtain

---

[1] ORS 164.055 was amended in 2009. Or Laws 2009, ch 16, § 3; Or Laws 2009, ch 610, § 6. Those amendments do not apply because defendant's conduct occurred before the effective date of the amendments. Or Laws 2009, ch 16, § 8; Or Laws 2009, ch 610, § 11.

or retain a health care payment in an amount greater than that to which the person is or was entitled."

As mentioned, the state prosecuted defendant for Counts 1 through 8 under the theory that she aided and abetted Gaither and DeWeese in committing those crimes. As pertinent here, "[a] person is criminally liable for the conduct of another person constituting a crime if * * * [w]ith the intent to promote or facilitate the commission of the crime the person * * * [a]ids or abets or agrees or attempts to aid or abet such other person in planning or committing the crime[.]" ORS 161.155(2)(b). Thus, for accomplice liability to attach, the person (1) must have the requisite *mens rea*— intent to promote or facilitate the commission of the crime— and, at the same time, (2) must perform the requisite *actus reus*—aiding, abetting, or agreeing or attempting to aid or abet the principal in planning or committing the crime.

We discussed the requirements for accomplice liability in *State ex rel Juv. Dept. v. Holloway*, 102 Or App 553, 556, 795 P2d 589 (1990). In that case, the evidence showed that a group of six to nine male youths were in a pickup truck that was involved in a drive-by shooting. The state charged one of the youths with attempted murder, arguing that the youth either fired the shots or aided and abetted another who fired the shots. The juvenile court found the youth within its jurisdiction for committing acts that, if committed by an adult, would constitute attempted murder. The youth appealed, arguing that the state had failed to present evidence that would allow a rational factfinder to infer, beyond a reasonable doubt, that the youth had committed the alleged act. We first held that the state had failed to present sufficient evidence that the youth had committed attempted murder as a principal. *Id.* at 556. We then framed the remaining question of accomplice liability as follows:

> "The issue is whether the evidence allows us to infer beyond a reasonable doubt that child possessed the requisite '*intent to promote or facilitate*' *and* that child *advised, counseled, procured, encouraged, countenanced, assisted or gave aid* to the principal actor. ORS 161.155(2)(b); *State v. Rosser*, 162 Or 293, 344, 91 P2d 295 (1939); *State v. Start*, 65 Or 178, 182, 132 P 512 (1913)."

*Id.* ("and" emphasized in original; other emphases added).

We held that the state had failed to present evidence that would allow a rational factfinder to infer, beyond a reasonable doubt, that the youth had aided and abetted in the shooting. *Id.* at 557-58. Although the state had proved beyond a reasonable doubt that the youth was in the truck at the time of the shooting, we noted that "mere presence at a crime is insufficient to establish aiding and abetting." *Id.* at 557 (citing *State v. Moriarty*, 87 Or App 465, 468, 742 P2d 704, *rev den*, 304 Or 547 (1987)). As to intent, although statements shouted from the truck immediately before the shooting would allow a rational factfinder to infer that *someone* in the truck possessed the requisite intent to aid and abet, no evidence suggested that the youth made those statements. *Id.* at 558. Thus, we reversed the juvenile court.

As *Holloway* illustrates, mere knowledge of, or presence during, the commission of a crime is insufficient to establish accomplice liability. Applying that rule, we conclude that—given the state's evidence, which we review below—a rational trier of fact could find that defendant aided, abetted, or agreed or attempted to aid or abet Gaither or DeWeese in their commission of first-degree theft or making a false claim for health care payment during January and February 2009—that is, Counts 1 and 2 only. No rational trier of fact could find that defendant aided, abetted, or agreed or attempted to aid or abet Gaither or DeWeese in their commission of first-degree theft and making a false claim for health care payment during June through December 2008—that is, Counts 3 through 8.

We begin with defendant's signature on the 2005 client plan. Even assuming that, when defendant signed the plan, she knew that the information on it was false, there is simply no evidence that she signed the plan with the intent to promote or facilitate crimes that Gaither and DeWeese committed more than two years later, in 2008 and 2009. Thus, no rational factfinder could infer, from defendant's signature on the 2005 client plan, that defendant aided, abetted, or agreed or attempted to aid or abet Gaither or DeWeese in committing theft or making a false claim for health care payment in 2008 and 2009, when those payments were based on superseding client plans.

We turn to defendant's phone call to Mesirow. Mesirow testified that, in June 2008, defendant called to tell her that Gaither was going to see a doctor regarding his increased difficulty swallowing. During the course of the call, defendant also "ask[ed] for increased hour[s] for the home care worker if it was needed for this week as she was working." Mesirow requested that defendant call her after Gaither's doctor's appointment to discuss whether additional hours would be needed. Defendant did not call again, Mesirow assumed that additional care "wasn't necessary," and the number of authorized hours did not change as a result of the call. The state asserts, however, that, because a foster care employee testified that Gaither drank a cup of coffee at a foster parent training class during June 2008, and because defendant was present at the training, a factfinder could reasonably infer that defendant's call to Mesirow constituted aid to Gaither and DeWeese that was made with the intent to promote or facilitate their scheme.

The state's argument is unavailing. It is simply too speculative to infer that, because Gaither was able to drink a cup of coffee during June 2008, he was not experiencing swallowing problems, and that therefore, during a phone call that same month, defendant misrepresented Gaither's condition to Mesirow with the intent to facilitate Gaither or DeWeese's scheme to obtain provider payments for DeWeese. Furthermore, defendant's request for *additional* hours of care if needed during a particular week does not support a reasonable inference that defendant was aiding or abetting, or attempting to aid or abet, the provision of home health care payments that DeWeese was *already receiving.* Thus, the phone call does not support a reasonable inference that, with the intent to promote or facilitate the commission of theft and making a false claim for health care payment, defendant was attempting to aid or abet Gaither or DeWeese in committing those crimes.

We proceed to the February 2009 letter that defendant wrote to Mesirow. As mentioned, defendant and Gaither's 2007 and 2008 applications for food stamps included receipts for child care expenses paid to DeWeese. Mesirow sought clarification as to why defendant's school-age children required child care. Defendant's letter, which

was delivered to Mesirow, explained, "I requested Francine DeWeese to be here at 5:00 AM when I leave for work, [to] make sure the kids get on the bus, then she assist[s] my husband with [his] daily needs *** also she would make sure my kids get safely in the house until I arrived." According to the state, the letter gives rise to a reasonable inference that "defendant knew Gaither and DeWeese were claiming Gaither needed all-day care from DeWeese."

The state's argument is persuasive with respect to Counts 1 and 2. A rational factfinder could understand the letter to mean that, from the time defendant's children left for school in the morning until the time they arrived home in the afternoon, Gaither required assistance with "daily needs," and that DeWeese provided that assistance. From there, the same factfinder could infer that defendant wrote the letter not only to demonstrate her eligibility for food stamp benefits, but also to remind Mesirow—who requested the explanation and to whom the letter was delivered—that Gaither needed the services that DeWeese was providing and that DeWeese was actually providing those services. Thus, a rational factfinder could reasonably infer that defendant wrote the letter with the intent to promote Gaither's or DeWeese's commission of theft or making a false claim for health care payment, at least from the time of the letter forward.

Of Counts 1 through 8, the only counts that allege conduct that occurred after defendant wrote the letter are Counts 1 and 2, which allege theft and making a false claim for health care payment, respectively, during January and February 2009. Evidence in the record shows that Gaither signed, and DeWeese received, at least one home health care payment after defendant wrote the letter. Thus, a rational factfinder could reasonably infer that, with the intent to promote or facilitate Gaither's or DeWeese's commission of theft or making a false claim for health care payment from January 1, 2009 through February 28, 2009, defendant aided, abetted, or agreed or attempted to aid or abet Gaither or DeWeese in committing those crimes. However, no rational factfinder could find that defendant was liable for the conduct charged in Counts 3 through 8, which occurred before she wrote the letter.

We turn to Counts 40 and 41, which allege that defendant unlawfully obtained a food stamp benefit on or about August 30, 2008 and November 3, 2008, respectively, and Counts 42 and 43, which allege that defendant committed first-degree theft of a food stamp benefit on or between August 1, 2008 and December 31, 2008, and January 1, 2009 and April 30, 2009, respectively.

At the time of the charged conduct, ORS 411.840(1) (2007), *amended by* Or Laws 2009, ch 599, § 7, provided:

> "No person shall knowingly obtain or attempt to obtain, or aid or abet another person in obtaining or attempting to obtain, any food stamp benefit under a food stamp plan to which the person or such other person is not entitled to receive or use under ORS 411.806 to 411.845, or under any rule or regulation promulgated pursuant to ORS 411.806 to 411.845."

As previously mentioned, a person commits first-degree theft when, as relevant here, "with intent to deprive another of property or to appropriate property to the person or to a third person, the person * * * [t]akes, appropriates, obtains or withholds such property from an owner thereof," ORS 164.015(1), and the property has value of $750 or greater, ORS 164.055(1)(a) (2007).

On appeal, defendant argues that evidence that DeWeese was providing child care to other children does not support a reasonable inference that defendant was not paying DeWeese to care for defendant's children. Thus, according to defendant, her deduction of child care expenses from her income on the 2007 and 2008 food stamp applications was not unlawful. Defendant also argues that evidence that the state paid defendant to care for foster children beginning in August 2008 does not support a reasonable inference that defendant knowingly omitted that income from her October 2008 food stamp application, which did not have a designated space for foster child income.

In response, the state argues that, as a result of defendant and Gaither's joint attendance at foster parent trainings and meetings, defendant would have been aware "that Gaither was able to care for children. She thus would have known that she did not need DeWeese to provide child

care. If defendant knew she did not need DeWeese for child care, it makes no sense that she would *pay* her for that unnecessary care[.]" (Emphasis in original.) The state also asserts that the evidence supports a reasonable inference that defendant knowingly omitted the foster child income from her 2008 food stamp application. According to the state, because the food stamp application form had spaces designated for "lodger" income and "other" income, "it was reasonable to infer that defendant knew lodger income meant a foster child living in the home, and that 'other income' meant *all* other money being received." (Emphasis in orginal.)

For a factfinder to find that defendant committed the crimes alleged in Counts 40 and 42, which stemmed from the 2007 food stamp application, the factfinder would have to find that defendant knowingly overstated her expenses, thus enabling her to receive food stamp benefits that she was not lawfully entitled to receive. Defendant's February 2009 letter stated that DeWeese arrived at defendant's house at 5:00 a.m. and stayed until the children left for school; assisted Gaither with his "daily needs"; and was present when the children arrived home from school, which Shaffer testified was at approximately 3:00 p.m. Surveillance from January 15, February 3, and February 5, 2009, demonstrated that, at the times when defendant stated that DeWeese was caring for her children at defendant's house, DeWeese was not present. Evidence that DeWeese was not providing care for defendant's children supports a reasonable inference that defendant was not paying DeWeese for that care. Thus, a rational factfinder could find that defendant submitted false receipts for child care payments to DeWeese and thus knowingly obtained food stamp benefits that she was not entitled to receive.

For a factfinder to find that defendant committed the crimes alleged in Counts 41 and 43, which stemmed from the 2008 food stamp application, the factfinder would have to conclude that defendant either knowingly overstated her expenses or knowingly understated her income. Defendant did not include on the 2008 food stamp application the income that she received as a result of caring for a foster child. At the time she submitted the 2008 food stamp application, she had been receiving that income for more

than two months. The food stamp application contained designated spaces for "lodger" and "other" income. From that evidence, a rational factfinder could reasonably infer that defendant knowingly obtained food stamp benefits that she was not entitled to receive. From the same evidence, a rational factfinder could also infer that defendant, with intent to deprive the state of property, took, appropriated, or obtained that property, which had a value of more than $750.

Finally, we address Count 45, the conviction for income tax evasion. On appeal, defendant argues that the state failed to present evidence that defendant's nephew did *not* live in her home during at least half of 2008. The state responds that, "based on [defendant's] numerous representations about who lived in her home that year [2008], none of which included [her nephew], it reasonably could be inferred that [her nephew] never lived there during that year."

As pertinent here, ORS 314.075 defines income tax evasion as follows:

"No person * * * shall, with intent to evade any requirement of any law imposing taxes upon or measured by net income or any lawful requirement of the Department of Revenue thereunder:

"* * * * *

"(2)   Make, render, sign or verify any false or fraudulent return or statement[.]"

We conclude that the trial court did not err in failing to enter a judgment of acquittal on Count 45. Defendant's 2008 income tax return, to which Count 45 pertains, claims defendant's nephew as a dependent. That tax return, which defendant signed electronically, states, "Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and accurately list all amounts and sources of income I received during the tax year." Defendant's tax preparer testified that, for a taxpayer to claim a child as a dependent, the child must reside in the taxpayer's home for more than 50 percent of the relevant year. The tax preparer also testified that, due to rounding, defendant would have to have reported that her

nephew lived in her home for at least seven months for the child to be classified as a dependent. Thus, defendant must have reported to the tax preparer, and verified with her signature, that her nephew lived in her home for at least seven months during 2008.

The state introduced ample evidence from which a factfinder could have reasonably inferred that defendant's nephew did not live with defendant for at least seven months during 2008. On December 27, 2007, a foster parent recruiter visited defendant and Gaither at their home and was introduced to defendant's two children, whom the recruiter assumed were the only two children living the house. In July 2008, defendant told a foster care worker that her son and daughter were living in her home. Defendant filled out fire drill reports in August, September, November, and December 2008. The drills were conducted at varying times of day, and none of the reports recorded the presence of defendant's nephew, who was about four years old at the time. From those facts, a rational factfinder could reasonably infer that defendant's nephew did not live in her home for at least seven months during 2008, and that, with the intent to evade the requirements of law, defendant verified a false income tax return.

In sum, a rational factfinder could reasonably find, based on the evidence in the record, that the state proved the essential elements of Counts 1, 2, 40 through 43, and 45. On the other hand, no rational factfinder could find that the state proved the essential elements of Counts 3 through 8. Thus, the trial court did not err in failing to enter a judgment of acquittal on Counts 1, 2, 40 through 43, and 45, but did err in failing to enter a judgment of acquittal on Counts 3 through 8.

Convictions on Counts 3 through 8 reversed and remanded; remanded for resentencing; otherwise affirmed.