Argued and submitted October 27, 2021, reversed and remanded June 2, 2022

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

SERGIO ALEXIS RODRIGUEZ,
*Defendant-Appellant.*

Marion County Circuit Court
19CR18197, 14C40225;
A171770 (Control), A171771

511 P3d 424

In this consolidated criminal case, defendant assigns error to the denial of his motion to suppress evidence. Specifically, defendant argues that officers lacked reasonable suspicion that defendant had committed an unlawful gun transaction or related crime when they stopped him based on a report regarding a gun transaction in a parking lot. The state contends that the officers had reasonable suspicion that defendant had committed conspiracy to improperly transfer a firearm, ORS 166.418; conspiracy to unlawfully purchase a firearm, ORS 166.425(1); conspiracy to unlawfully possess a firearm within a vehicle, ORS 166.250(1)(b); and those same crimes under an aiding and abetting theory. *Held*: The officers lacked information that would indicate that defendant in particular had committed an unlawful firearm transaction or related crime. Defendant was entitled to the suppression of any state evidence derived from his unlawful stop, in particular, evidence that the state identified defendant as the man in blue who had been present during the gun transaction.

Reversed and remanded.

J. Channing Bennett, Judge.

Joshua B. Crowther, Deputy Public Defender, argued the cause for appellant. Also on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Jeff J. Payne, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Ortega, Presiding Judge, and Shorr, Judge, and Powers, Judge.

SHORR, J.

Reversed and remanded.

**SHORR, J.**

In this consolidated criminal case, defendant appeals from two judgments: a judgment convicting him of felon in possession of a firearm, ORS 166.270(1), and a judgment revoking his "second look" conditional release in an unrelated case.[1] Defendant assigns error to the denial of his motion to suppress evidence discovered after he was stopped, arguing that officers stopped him without reasonable suspicion that he had committed a specific crime or type of crime. We conclude that the trial court indeed erred in concluding that the officers had reasonable suspicion to stop defendant, and likewise erred in denying defendant's motion to suppress. Accordingly, we reverse and remand.

In reviewing a trial court's ruling on a motion to suppress evidence for legal error, we are bound by the court's findings of fact if they are supported by constitutionally sufficient evidence in the record. *State v. Baker*, 350 Or 641, 650, 260 P3d 476 (2011). Where the trial court did not make express factual findings and there is evidence from which such facts could be decided in more than one way, we presume that the court decided those disputed facts in a manner consistent with its ultimate conclusion. *State v. Powell*, 288 Or App 660, 662, 406 P3d 1111 (2017), *rev den*, 362 Or 508 (2018). We summarize the facts consistently with that standard.

On March 15, 2019, a witness named Robinson called 9-1-1 to report that he had just observed a firearm transaction between three men in the parking lot of his apartment complex, "right out front" of his apartment. Robinson reported that he observed a white Scion or similar model car enter the parking lot of the apartment complex. Robinson observed a man who "looked kind of like a gangster" and who was "decked in one color" get out of the Scion and stand around waiting for about five minutes. That man, later identified as defendant's brother David,[2] appeared to

---

[1] Specifically, defendant was found in violation of two conditions of his conditional discharge: first, the condition that he not possess firearms, and second, the condition that he obey all laws as directed.

[2] Because defendant and his brother have the same last name, we refer to the brother by his first name.

be of "Mexican or Islander descent," in his 20's, "[m]aybe five feet six inches to five feet eleven inches" tall, of thin build, with "[d]ark black" hair. Robinson further articulated that David was wearing "a black and red hat on backwards" with a red shirt and "[e]xtremely baggy" black pants. Robinson provided the Scion's Oregon license plate number.

Next, Robinson observed a white Volvo with Texas license plates pull into the parking lot. Robinson recognized the Volvo because he had seen it in the parking lot before. Specifically, Robinson reported that the Volvo "seems to do some deals here." A man exited the Volvo and met David at the back of the Volvo where they opened the trunk and began inspecting a handgun.[3] At that point, a man later identified as defendant, who Robinson described as "Mexican or Islander" and dressed in "all blue," exited the front passenger seat of the Scion and met the other men at the back of the Volvo. David pulled money out of his pocket and handed it to the man from the Volvo. Robinson described the gun as a bigger black handgun that had the shape of a pistol "like a 1911." Finally, David wrapped the gun in a white T-shirt, and David and defendant returned to their vehicle and left the apartment complex.[4] Robinson described the men as "all gangstered out," "hoodlums," and "[p]eople who shouldn't have a gun."

Officers Slivkoff and Scott received the report from dispatch and responded to the area. Slivkoff's knowledge at the time was that Robinson had reported "an exchange of an item for a firearm" and had provided "a description of two of the involved parties, the vehicles that were involved, and a license plate." Scott described the call as, "a witness had seen somebody collect a firearm somehow" and "somebody had a gun, they got it from somebody else, and they put it in the car."

Slivkoff ran the plate number and determined that the vehicle was registered to a woman at a nearby apartment complex. Slivkoff headed towards that address and soon

---

[3] Robinson did not provide a description of the individual driving the Volvo other than that he was male.

[4] An individual who Robinson did not describe remained in the driver's seat of the Scion throughout the interaction.

caught up with the vehicle, where she determined that it was a silver Kia Soul with the same number of occupants and same license plate number as provided in Robinson's report. The vehicle entered the apartment complex parking lot and parked. All three occupants got out, shut the doors, and started to quickly leave in separate directions. At that time, Slivkoff and Scott stopped the occupants. David matched the description that Robinson had provided of the man in red, but defendant was wearing a black football jersey and blue jeans. A third officer, Renz, arrived shortly afterwards.

Scott "contacted" defendant, "asked him what they were doing," and "told him that we were there because we *** got a call about a possible firearm being transferred to the car, and wanted to know if he had anything to do with it." Defendant responded that "he was coming home," that he was "going to pick up his brother from North Salem High School," and told Scott that his brother was "in the apartment." Scott asked defendant, "how is he in the house when you just pulled up?" Defendant did not answer and Scott "put him in handcuffs and put him in the back of the car."

Upon determining that the vehicle's registered owner was not present, Slivkoff contacted the owner, who was David and defendant's mother, and later received consent to search the vehicle. A search of the vehicle revealed one 9mm handgun in the center console, one .45 caliber handgun in a black backpack "on the rear floorboards," and an all-black plastic handgun in the same backpack. The backpack was located where David had been sitting. After receiving *Miranda* warnings, David told Slivkoff that both guns were his, and admitted to having just purchased the larger .45 caliber weapon.

Around that time, *after* the officers had stopped the occupants of the vehicle, Slivkoff called Robinson "to get some further information." Robinson later testified to additional details about the transaction, including that he had observed the transaction from approximately 20 yards away, that he had noticed that defendant had long hair and was wearing a hat, and that when defendant joined the other two men at the trunk of the Volvo, defendant held and inspected the firearm himself for a period as he said

something to David. Robinson testified that defendant then returned the gun to David, who handed money to the man from the Volvo before wrapping the gun in the white T-shirt. However, the record is unambiguous that that information was relayed to the police *after* they stopped defendant and the other occupants of the vehicle. Accordingly, as we discuss further below, it is not part of our analysis of whether the police had reasonable suspicion that defendant had committed a crime at the time the officers executed the stop.

Defendant was charged with felon in possession of a firearm on the theory that, during the transaction, he had briefly possessed the .45 caliber handgun that was discovered in the backpack at David's feet. The state also alleged in an unrelated case that defendant had violated the conditions of his second look conditional release based on the same incident. As the case proceeded towards trial, defendant moved *in limine* to exclude Robinson's out-of-court and in-court identifications of defendant as the man in blue. That motion was denied.[5] Defendant waived his right to a jury and a bench trial followed.

On the morning of trial, defendant filed a motion to suppress "the evidence illegally obtained following the unlawful seizure of defendant," as well as a motion to continue trial to allow for time to hold a pretrial hearing on the suppression motion. The trial court denied the motion to continue as "untimely" and not "well-founded," and, having presided over the hearing on defendant's motion *in limine* the week before, stated that "I've heard the testimony of what occurred, and it certainly meets the standards of reasonable suspicion that a crime had occurred." However, the court permitted defendant "to raise [the suppression issue] during the trial."

After the state presented its case at the bench trial and rested, defendant renewed his motion to suppress the evidence and argued that he had been stopped without reasonable suspicion. The state responded by arguing that,

> "in this instance, there's more than reasonable suspicion, but that there's actually probable cause to search the

---

[5] Defendant does not assign error to that ruling on appeal.

vehicle. Based on a description of two individuals purchasing guns out of the back of a vehicle that *** had been associated with other criminal activity, given the description of exactly what David Rodriguez was wearing ***, carrying that firearm in a T-shirt, concealing it in *** such a way, showing that it's not this open, legal sale, and then taking that gun, getting it in the vehicle and leaving, and then being located at the scene wearing the exact same clothing[.]"

The trial court ruled that a stop occurred when the officers "converged on the scene" as defendant and the other occupants exited the vehicle. The court also found that there was reasonable suspicion to stop defendant at that point:

"Robinson saw a transaction occur out of the trunk of a car which he believes has been engaged in illegal activity or drug sales activity in his complex, and that he or his mother have called the police on several times. He gave a description of the car, including the license plate, and complained about the firearm and identified the firearm. And how he identified it, he's been consistent in that. That's reasonable suspicion."

The court also concluded that the only evidence discovered as a result of the stop was the guns, which had been discovered subject to a consent search.[6] The court denied the motion to suppress, and defendant was later convicted of felon in possession of a firearm.

Defendant appeals the denial of his motion to suppress, arguing that the officers "did not have sufficient information to reasonably believe that defendant had committed a crime or had made an unlawful firearm purchase." As a result, defendant argues that we should "suppress defendant's identity and connection to the crime," because "[b]ut for the stop, defendant would have kept walking from the car and would have had no interaction with the police whatsoever."[7] We review the denial of defendant's suppression

---

[6] As we later discuss, however, the officers also discovered defendant's identity and connection to those guns as a result of the stop.

[7] The state argues that defendant never preserved an argument below that he was entitled to the suppression of his identity as a piece of evidence derived from the stop. Having reviewed the record, we conclude that defendant's argument on appeal is properly preserved for our review.

motion for errors of law. *State v. Eastman*, 269 Or App 503, 506, 345 P3d 493 (2015).

On appeal, defendant raises two main arguments: (1) that nothing about Robinson's initial report to police indicated that an illegal firearm transfer or other related crime had occurred; and (2) that, even if it was reasonable for the officers to believe that the sale was unlawful, that that would only create liability for the man from the Volvo, the seller, and not for defendant. In response, the state argues that the officers did have specific and articulable facts to support a reasonable belief that defendant was involved in a type of unlawful firearm crime. Specifically, the state argues that the officers had reasonable suspicion that defendant had committed conspiracy to improperly transfer a firearm, ORS 166.418; conspiracy to unlawfully purchase a firearm, ORS 166.425(1); conspiracy to unlawfully possess a firearm within a vehicle, ORS 166.250(1)(b); and those same crimes under an aiding and abetting theory.

Neither party disputes the trial court's finding that defendant was stopped when he was approached by Scott and other officers as he exited the parked vehicle, or that Scott subjectively believed that he had reasonable suspicion to stop defendant. Therefore, the issue before us is whether that subjective belief was objectively reasonable. As we explain, we conclude that the officers lacked individualized reasonable suspicion to stop defendant, because even if it was reasonable to believe under the circumstances that Robinson had observed some sort of gun transaction crime, the specific and articulable facts known to the officers at the time of the stop did not support a reasonable belief that *defendant specifically* had committed any of the crimes that the state proposes.

We begin with the controlling law. Article I, section 9, of the Oregon Constitution protects the rights of "people to be secure in their persons *** against unreasonable search, or seizure." An investigatory stop is a warrantless seizure that is *per se* unreasonable unless supported by reasonable suspicion of a crime. *State v. Gilkey*, 317 Or App 752, 757, 505 P3d 1029 (2022). Reasonable suspicion exists when an officer "reasonably suspect[s]—based on specific and articulable

facts—that the person committed a specific crime or type of crime." *State v. Maciel-Figueroa*, 361 Or 163, 182, 389 P3d 1121 (2017). In other words, the officer's subjective belief that a specific crime or type of crime has been committed must be "objectively reasonable under the totality of the circumstances existing at the time of the stop." *Id.* "Reasonable suspicion does not require that the facts as observed by the officer conclusively indicate illegal activity but, rather, only that those facts support the reasonable inference of illegal activity by that person." *State v. Dampier*, 244 Or App 547, 551, 260 P3d 730 (2011) (internal quotation marks omitted). It is the state's burden to establish that an officer had reasonable suspicion to initiate a stop. *State v. Westcott*, 282 Or App 614, 618, 385 P3d 1268 (2016), *rev den*, 361 Or 486 (2017).

We pause here to reiterate the totality of the circumstances known to the officers at the time they stopped defendant: A concerned citizen had called to report some sort of brief gun transaction or sale in the parking lot of the caller's apartment complex. The caller described the buyer or transferee as a "Mexican or Islander" male in his 20's, five feet six inches to five feet eleven inches in height, thin build, with dark black hair, wearing a black and red hat, a red shirt, and baggy black pants, who was riding as a passenger in a white Scion or similar car with a specific Oregon license plate number. The caller described the transferor or seller as a man driving a white Volvo who he had seen doing "deals" at the complex before, although he did not elaborate on what that meant. The caller relayed that the two men had met at the back of the Volvo and that a "Mexican or Islander" male dressed in all blue got out of the Scion and joined them. The seller got out a gun and the buyer inspected it before the buyer removed money from his pocket, handed it to the seller, and wrapped the gun in a white T-shirt. Then all three men returned to their respective vehicles and left.

Soon after, the officers spotted a vehicle similar to Robinson's description with a matching plate and three occupants as described. The man in the back seat matched the description of the man in red completely, while the description of defendant was somewhat off. The occupants parked and attempted to leave quickly in different directions before

they were stopped. Finally, although Robinson described the men as "all gangstered out," "hoodlums," and "[p]eople who shouldn't have a gun," it is unclear whether those characterizations were communicated to the responding officers. Regardless, those characterizations are not specific and articulable facts that could support reasonable suspicion on this record.

On balance, the only information the officers had about *defendant* was that he was "Mexican or Islander," that he was dressed in all blue, that he was traveling with the buyer in red in the same vehicle, that he was physically present near the buyer when the buyer handed over money and the purchase was consummated, and that he moved away from the car quickly in the moments before he was stopped. Essentially, those facts establish only that defendant was a person who was present when a firearm was transferred or sold. Although Robinson *later* testified that he had observed David and defendant passing the handgun back and forth and "inspecting it" before David handed over money, consummating the transaction, the record is unambiguous that the officers did not have that information at the time they stopped defendant.

Considering the dearth of information that would indicate that *defendant in particular* had committed a specific crime or type of crime, we reject the state's contention that specific and articulable facts supported the officers' belief, at the time defendant was stopped, that defendant had committed an unlawful firearm transaction or related crime. We briefly consider each specific crime the state offers as a possible basis for reasonable suspicion and reject each in turn.

First, the totality of the circumstances present in this case do not support a reasonable belief that defendant had committed the crime of conspiracy to improperly transfer a firearm. The crime of improperly transferring a firearm is defined by ORS 166.412 and ORS 166.418. ORS 166.412 requires that a gun dealer, or "a person engaged in the business, as defined in 18 U.S.C. 921, of selling, leasing or otherwise transferring a firearm," must comply with various requirements before delivering a firearm to a purchaser.

ORS 166.412(1)(f), (2). Those requirements include, but are not limited to, that the dealer shall complete a firearms transaction record, obtain the purchaser's signature on that record, obtain the thumbprints of the purchaser on a separate thumbprint form, request a criminal history record check on the purchaser, and receive and record a unique approval number from the department that conducted the record check. ORS 166.412(2). Under ORS 166.418, a gun dealer—notably, *not* a purchaser, transferee, or other party to the transaction—who "sells, leases or otherwise transfers a firearm and intentionally violates ORS 166.412" is guilty of the Class A misdemeanor of improperly transferring a firearm. Additionally, ORS 166.412 does not mandate that a dealer complete the necessary paperwork, background check, and other requirements *immediately* before the delivery of the firearm. As relevant here, a person is guilty of criminal conspiracy if, "with the intent that conduct constituting a crime punishable as a * * * Class A misdemeanor be performed, the person agrees with one or more persons to engage in or cause the performance of such conduct." ORS 161.450(1).

Here, the facts known to the officers at the time they stopped defendant did not give rise to a reasonable belief that defendant agreed with one or more persons to engage in or cause an illegal gun transfer with the intent that an illegal gun transfer be performed. Defendant's physical proximity to the transaction, association with the purchaser, and quick movement away from the car before the stop were the only facts known to the officers at the time they stopped defendant that could plausibly support an inference that defendant made any agreement to engage in or cause an illegal gun transfer, and we reject the contention that those facts alone could support such an inference.[8]

_____

[8] To the extent that the state contends that Robinson's description of defendant's "all blue" clothing provided a specific and articulable fact in support of the officer's reasonable suspicion that defendant had committed *any* crime, including the crime of conspiracy to improperly transfer a firearm, we reject that argument. Although Robinson's 9-1-1 call described David and defendant as "decked in one color," the state did not elicit any testimony that would explain the significance, if any, of such clothing. And, as we explained earlier, we do not consider Robinson's descriptions of the men as "gangster[s]" or "hoodlums" to be specific and articulable facts for purposes of this analysis.

*Cf. State v. Kingsmith*, 256 Or App 762, 773, 302 P3d 471 (2013) (no individualized reasonable suspicion of drug crime to stop backseat passenger in car that had stopped briefly at remote interstate overpass where driver appeared to exchange something with second vehicle, and where driver had pending case for marijuana crimes and sores on his face "consistent with methamphetamine use," driver and front passenger both appeared nervous, and car had "faint odor of marijuana"; none of those facts indicated "that defendant was involved in the exchange that occurred on the overpass beyond her mere presence in the car"); *State v. Regnier*, 229 Or App 525, 536, 212 P3d 1269 (2009) (no individualized reasonable suspicion to stop defendants present at party where minors were consuming alcohol and who walked away when officer approached; "presence, in and of itself, is not enough under the law to give rise to a reasonable inference that defendants had [furnished alcohol to minors]").

    The state's arguments that the officers had reasonable suspicion that defendant had committed the crimes of conspiracy to unlawfully purchase a firearm, ORS 166.425(1), and conspiracy to unlawfully possess a firearm within a vehicle, ORS 166.250(1)(b), are similarly unsupported. "A person commits the crime of unlawfully purchasing a firearm if the person, knowing that the person is prohibited by state law from owning or possessing the firearm or having the firearm under the person's custody or control, purchases or attempts to purchase the firearm." ORS 166.425(1). The state appears to argue that the clandestine nature of the transaction gives rise to not only an inference that David purchased the firearm with knowledge that he was prohibited from possessing it, but also an inference that defendant conspired to effectuate that unlawful purchase. Assuming the first part of that argument is supportable—an individual's concealment of an item could support a reasonable inference that the item is contraband—the second part of the state's argument does not follow, because, again, defendant's mere presence during the gun transfer does not give rise to a reasonable inference that he conspired to engage in or cause that transfer. ORS 166.250(1)(b) provides that, except for exceptions not relevant here, "a person commits the crime of unlawful possession of a firearm if the person

knowingly *** [p]ossesses a handgun that is concealed and readily accessible to the person within any vehicle[.]" The state contends, as we understand it, that the officers had reasonable suspicion to believe that defendant conspired with David to unlawfully possess the purchased handgun by having it concealed but readily accessible in the vehicle. But again, defendant's mere presence does not support that theory.

Finally, the state argues that the officers also had reasonable suspicion to stop defendant for improperly transferring a firearm, ORS 166.418; unlawfully purchasing a firearm, ORS 166.425(1); or unlawfully possessing a firearm within a vehicle, ORS 166.250(1)(b); pursuant to an aiding and abetting theory of liability. Under ORS 161.155(2)(b), a person is criminally liable for the criminal conduct of another if the person "[a]ids or abets or agrees or attempts to aid or abet such other person in planning or committing the crime" and does so "[w]ith the intent to promote or facilitate the commission of the crime." However, it is well established that mere presence during the commission of a crime is insufficient to establish such liability. *State v. Stewart*, 259 Or App 588, 601, 314 P3d 966 (2013).

Thus, we conclude that the officers lacked reasonable suspicion that defendant had committed a type of gun transaction or related crime, and therefore lacked a constitutional basis to stop him. As a result, the trial court erred in denying defendant's motion to suppress all the evidence discovered as a result of that stop.

Finally, we address the parties' arguments regarding the appropriate remedy. Defendant contends that the state's discovery of his identity and connection to the guns in the vehicle was a direct, derivative result of his unlawful stop.[9] In response, the state argues that suppression is unwarranted because defendant's identity and connection to the guns in the vehicle were also admitted as evidence

[9] Defendant conceded during oral argument that the guns themselves were discovered as a result of a consent search carried out with the consent of the vehicle's registered owner, defendant's mother, and therefore are not subject to suppression as a remedy for any earlier violation of defendant's constitutional rights. We accept that concession.

through Robinson's testimony and in-court identification, evidence that defendant does not challenge on appeal. We understand the state to contend that any error in denying the suppression motion was harmless because defendant's identity and connection to the crime were established by other means.

We must affirm a defendant's conviction even when a trial court commits error if "there is little likelihood that the error affected the verdict or substantially affected the defendant's rights." *State v. Garcia*, 284 Or App 357, 363, 392 P3d 815, *rev den*, 361 Or 645 (2017).

> "In assessing whether erroneously admitted or excluded evidence affected the verdict, we consider the nature of the evidence in the context of the trial as a whole. We therefore review all portions of the record, not just the evidence most favorable to the state. Among other factors, we consider whether the evidence was cumulative of other evidence admitted without objection, which includes assessing any differences in the quality of the erroneously admitted or excluded evidence as compared to the other evidence on the same issue. We also consider how the case was tried and the extent to which the disputed evidence was or was not emphasized by the parties and central to their theories of the case."

*State v. Simon*, 294 Or App 840, 849, 433 P3d 385 (2018), *rev den*, 365 Or 502 (2019) (internal citations omitted). Having reviewed the record, we conclude that the court's admission of the evidence at issue was not harmless.

First, police testimony regarding defendant's identity and connection to the guns was indeed evidence that was derived from defendant's unlawful stop, and the state put forward no argument that the officers would have inevitably discovered that evidence from some other source. Further, we reject the state's contention that the admission of that testimony was harmless because of similar evidence of defendant's identity and connection to the guns that was admitted through Robinson's testimony. Absent testimony from the responding officers that they had identified and detained defendant as he was leaving the suspect car, that he had been wearing similar clothing as the man in "all blue" described by Robinson, and that he had been seated

in the front passenger seat of the suspect vehicle—the same location where Robinson had seen the man in blue—the only evidence of defendant's identity and connection to the guns would have been admitted via Robinson's in-court identification at trial. But that identification accompanied testimony that Robinson had never seen the man in blue before that day, and that he had only seen him for a few minutes, from 20 yards away, nearly three months earlier. In other words, Robinson's identification of defendant as the man in blue was subject to considerable challenge on cross-examination that the police identification was not. Indeed, defendant's main defense at trial was that Robinson was inconsistent and unreliable as a witness. The police testimony as to defendant's identity and connection to the guns had the effect of corroborating Robinson's account. With that in mind, we cannot say that there is little likelihood that the erroneous admission of the police testimony identifying defendant and connecting him to the guns found in the vehicle affected the verdict in this case.

The Oregon exclusionary rule functions to vindicate a defendant's personal rights by placing a defendant who has been subject to a constitutional violation in the same position as if no violation had occurred. *State v. Davis*, 313 Or 246, 253-54, 834 P2d 1008 (1992). Here, defendant was entitled to the suppression of any state evidence derived from his unlawful stop absent reasonable suspicion, in particular, evidence that identified defendant as the man in blue who had been present during the gun transaction. As a result, we reverse and remand both judgments on appeal.

Reversed and remanded.