Argued and submitted July 9, 2019, reversed and remanded Juy 1, 2020

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

SAMUEL RAMIREZ,
*Defendant-Appellant.*

Yamhill County Circuit Court
16CR50083; A166595

468 P3d 1006

Defendant appeals from a judgment of conviction of one count each of carrying a concealed weapon, ORS 166.240, unlawfully possessing methamphetamine, ORS 475.894, and providing false information to a police officer, ORS 162.385. Defendant entered a conditional guilty plea reserving his right to seek appellate review of the trial court's denial of his motion to suppress. On appeal, defendant assigns error to that denial, first arguing that the trial court incorrectly determined that handcuffing defendant—an act which led to the discovery of a knife sheathed under defendant's sleeve—was justified by the officer safety exception to the warrant requirement under Article I, section 9, of the Oregon Constitution. Second, defendant argues that even if his detention for officer safety concerns was lawful, the subsequent search of his backpack, in particular an Altoids tin located within his backpack, was not a lawful search incident to arrest. *Held*: The trial court's denial of defendant's motion to suppress evidence resulting from the unjustified handcuffing of defendant was error. The trial court did not err, however, in its denial of defendant's motion to suppress evidence resulting from the lawful search of the backpack. Because this case arises as a conditional plea, the Court of Appeals remanded to the trial court for further proceedings, where defendant may elect to withdraw his plea as to the charge of carrying a concealed weapon, or may elect to withdraw his plea to all charges.

Reversed and remanded.

Ronald W. Stone, Judge.

Mary M. Reese, Deputy Public Defender, argued the cause for appellant. Also on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Hannah K. Hoffman, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Lagesen, Presiding Judge, and DeVore, Judge, and James, Judge.

JAMES, J.

Reversed and remanded.

**JAMES, J.**

Defendant appeals from a judgment of conviction of one count each of carrying a concealed weapon, ORS 166.240, unlawfully possessing methamphetamine, ORS 475.894, and giving false information to a police officer in connection with a citation, ORS 162.385. Defendant entered a conditional guilty plea reserving his right to seek appellate review of the trial court's denial of his motion to suppress. On appeal, defendant assigns error to that denial, first arguing that the trial court incorrectly determined that handcuffing defendant—an act which led to the discovery of a knife sheathed under defendant's sleeve—was justified by the officer safety exception to the warrant requirement under Article I, section 9, of the Oregon Constitution, which requires an officer's objectively reasonable suspicion, based on specific and articulable facts, that defendant poses an immediate threat of serious physical injury. Second, defendant argues that even if his detention for officer safety concerns was lawful, the subsequent search of his backpack, in particular an Altoids tin located within his backpack, was not a lawful search incident to arrest.

We agree with defendant that objectively reasonable officer safety concerns did not justify the handcuffing of defendant. That act led to the discovery of the knife, and in turn the charge of carrying a concealed weapon, ORS 166.240. We reverse the trial court's ruling on that aspect of defendant's motion to suppress. However, we affirm the trial court's ruling as to the search of the backpack that led to evidence in support of the charges of unlawfully possessing methamphetamine, ORS 475.894, and giving false information to a police officer, ORS 162.385. Because this case arises as a conditional plea, we remand to the trial court for further proceedings. At that time, defendant may elect to withdraw his plea as to the charge of carrying a concealed weapon, ORS 166.240, or may elect to withdraw his plea to all charges.

"We review the trial court's denial of the motion to suppress for legal error." *State v. Miller*, 267 Or App 382, 383, 340 P3d 740 (2014). "In reviewing a denial of a motion to suppress, we are bound by the trial court's findings of

historical fact that are supported by evidence in the record. We state the facts consistently with the trial court's explicit and implicit factual findings, which the record supports." *State v. Leiby*, 293 Or App 293, 294, 427 P3d 1141 (2018) (internal citation omitted).

Officers Harmon, Cerda, and LaRue were driving their respective patrol vehicles to a domestic disturbance when they saw defendant and two female companions violate the city's jaywalking ordinance by crossing the street at less than a 90-degree angle. None of the officers had previously encountered defendant or his companions or had any other knowledge about them. As the officers drove by, Harmon saw defendant shield his face, which, Harmon testified, officers "often encounter * * * when people don't want us to see who they are or identify them." Harmon did not clarify whether "people" referred specifically to defendant. The officers were unable to locate the disturbance, so Cerda radioed the other officers that he would circle back to find the jaywalkers. Harmon and LaRue provided backup support for Cerda, and the three officers drove back to the area where they had seen the jaywalkers.

On cross-examination, Harmon acknowledged that three patrol cars converging on a jaywalker might be viewed as unusual:

"[DEFENSE COUNSEL]: Okay. And so would you agree with me then that there was quite a show of force to deal with jaywalkers?

"[HARMON]: There were three of us there. If—if we're simply talking jaywalking, I think one could maybe see it that way.

"[DEFENSE COUNSEL]: Okay. And that's all you were there for, wasn't it, was jaywalking, three jaywalkers?

"[HARMON]: Well, I was there to cover Officer Cerda.

"[DEFENSE COUNSEL]: So that's a yes, there were three officers there to cover three jaywalkers?

"[HARMON]: Well, we also had additional information knowing—I mean I personally knew that Mr. Ramirez had—you know, just shielding his face, again, just an inkling that there's something else, but—but—

"[DEFENSE COUNSEL]:   So he didn't want to look at you?

"[HARMON]:   Uh-huh. It's possible.

"[DEFENSE COUNSEL]:   Okay. So a show of force for three people jaywalking and one of them who didn't want to look at you, correct?

"[HARMON]:   I would say that's correct."

Officer testimony shows that Cerda arrived first to the scene. He located the three individuals and asked them to stop. Although both of defendant's companions stopped immediately, defendant turned around to look at Cerda as he continued walking away. Cerda again asked defendant to stop, but defendant kept walking. When Harmon arrived on the scene shortly thereafter, defendant was still walking away.

Harmon testified that, in his training and experience, when "someone," not defendant in particular, refuses to stop, "[it] certainly raises a little concern *** especially given the nature of a pretty minor violation. *** [M]aybe they've done something that might be a violation, but usually it's [because] they believe or are wanted for something." He did not explicitly clarify whether defendant's refusal to stop made him suspect that defendant was wanted.

Shortly after Harmon arrived on the scene, defendant complied with the stop. LaRue arrived moments thereafter. Cerda and defendant's companions stood behind Cerda's patrol car while they discussed the jaywalking violation. Harmon explained that he had stopped defendant for failing to cross the street at a 90-degree angle. Defendant told Harmon that he believed that the city ordinance had been "thrown out" as unconstitutional. Harmon told defendant that, as far as he knew, the ordinance was constitutional. Defendant wanted to go "downtown so he could get wi-fi and look it up." Harmon told defendant that the ordinance was not on the internet; it was instead "on paper at the police department." That interaction was polite and not provocative. As that discussion occurred, LaRue walked back and forth between the front and back of the car, assisting both Cerda and Harmon.

Defendant refused to provide his name or date of birth and indicated that he had identification, but it was not with him. Harmon testified that when an individual, again, not defendant specifically, does not want to provide his name or date of birth, it is "another indication that somebody's possibly being deceptive \*\*\* probably for \*\*\* reasons of being wanted."

Defendant then provided Harmon a false name and date of birth, Sergio Rodriguez, which he twice misspelled without the second "r," "Rodiguez." Cerda attempted to verify the information using the computer inside his vehicle, but was unsuccessful. As LaRue walked back and forth between Cerda, who was inside his patrol car, Harmon, who was in front of the patrol car near defendant, and the female companions, who were behind the vehicle, one of the companions told LaRue that defendant's name was "Sam." At that point, LaRue and Cerda determined that defendant's true identity was Samuel Ramirez. LaRue testified:

> "[LARUE]:   We started going back and forth trying to find out who he was. And so I started talking to some of the females and trying to get information from them on who he was. And eventually I was told by one of the females—and I forget which one it was—that his name—his first name was Sam.
>
> "[PROSECUTOR]:   And what did you do with that information?
>
> "[LARUE]:   Well, as we were trying to figure out, again, Officer Cerda was, I believe, in his car trying to run names and \*\*\* figure out names. That everything kind of happened where I think Officer Cerda figured out who he was and we were kind of figuring out it was Sam Ramirez."

Meanwhile, defendant asked permission to sit on the curb. Harmon agreed. As defendant sat on the curb, about six or seven feet away from Harmon, he asked Harmon if defendant could put his cell phone in his backpack, which Harmon described as "odd." Harmon testified:

> "[PROSECUTOR]:   So then I had interrupted, but you said that he—he asked if he could put his phone in his backpack?
>
> "[HARMON]:   Yes, he did.

"[PROSECUTOR]:   And then what happened?

"[HARMON]:   I told him he could. And, again, I found it odd that, you know, he had wanted to do that, but—and then he proceeded to open the main compartment on—on the backpack which, again, kind of struck me and I was watching him.

"[PROSECUTOR]:   So let me stop you. Why did it strike you as odd that he wanted to put his cell phone in his backpack?

"[HARMON]:   If I'm putting away something small like that, I would probably use the outer pockets. I can access it quickly if I wanted, not into a larger compartment that it might be—be bounced around with other items.

"[PROSECUTOR]:   And why did it strike you as odd in the first place that he wanted to put it away?

"[HARMON]:   Because I think he had pockets on the clothing he was wearing. So he could just, you know, put in a pocket or something. So he—he went to put that, and I was watching him."

Further, Harmon testified that one aspect of defendant's behavior that made him subjectively concerned was that while defendant put the phone in the backpack, he looked at the officer. Harmon testified, "And he looked up at me as if to see if I was—I'm watching him. Maybe that's how I took it."

Despite Harmon's "inkling" about defendant possibly being wanted, and the fact that he still did not know defendant's name, he testified that those concerns did not prevent him from giving defendant permission to place the phone in the backpack:

"[PROSECUTOR]:   Okay. And so the things that you've articulated that you believe or that you've said caused you some concern, then why is it that you let him reach into the backpack if they were so concerning to you?

"[HARMON]:   It wasn't until the manner of how he reached into the backpack. I was wanting to let him— again, he was being cooperative. He wasn't running. I was watching the whole time. Honestly, I was ready for him as this went on, I mean it went on for a number of minutes.

I don't know the total timeframe from beginning to end, but and everything (phonetic) sometimes when people start thinking and they overthink or, you know, if they think they're getting in trouble, they might do something. They might run. They might fight. They might—we don't know what."

LaRue, who knew defendant's true identity at the time, watched Harmon stand over defendant as he reached his entire straightened right arm into the large main compartment of the backpack. LaRue testified:

"And as I looked over, I saw Officer Harmon standing kind of above Mr. Ramirez who was seated, and I saw Mr. Ramirez stick his hand inside of a backpack. He had his phone in his hand and placed it deep inside the backpack. At that point Officer Harmon like grabbed his hand and I kind of recall him saying, 'Don't put your hand in there.'"

Harmon thought defendant could possibly be reaching for a weapon. He testified that the totality of the circumstances—combining the concern that defendant might be wanted with the odd manner in which he reached into the backpack, which could have been weapon-related—led to safety concerns:

"Again, it was, ultimately, the manner in which he reached into the bag that was concerning. And that's what caused me to act to go physically detain him for our safety or the safety of not only of ourselves but of Mr. Ramirez. I did not know what he was accessing, what he was doing at that point."

Harmon reached inside the backpack to grab defendant's right wrist to handcuff him. Because LaRue was watching the interaction, he immediately grabbed defendant's left forearm to assist Harmon and felt a sheathed knife underneath his sleeve. LaRue called defendant by his real name, "Samuel," and threw the knife on the ground, out of reach. Defendant immediately confirmed his identity, that he was carrying a knife, and that he thought he had a warrant for his arrest, which he did not.

Harmon testified that when defendant confirmed his identity, he believed he had probable cause to arrest

defendant for providing false information to an officer. Officer Cerda put defendant in the back of his patrol car and placed the backpack outside the vehicle, on top of the trunk. Cerda testified that, when he searched defendant's backpack, he was not looking for evidence of any crimes, but his main concern was "weapons or any type of explosives." As part of that search, in the main compartment of the backpack, Cerda found a closed black nylon bag about "half the size of a sheet of paper." He opened the bag and found an Altoids can "smaller than an index card." He opened the Altoids can and found a clear plastic bag containing white crystal residue, which tested positive for methamphetamine.

Based on the evidence of the search, the state charged defendant with possessing methamphetamine, giving false information to police officers in furtherance of issuing a citation, and carrying a concealed weapon.

Before trial, defendant filed a motion to suppress the knife and methamphetamine residue. Defendant argued that the evidence should be suppressed because the officer safety exception, which requires objectively reasonable suspicion that defendant was an immediate threat, did not apply. Defendant specified that Harmon's subjective safety concerns that arose prior to defendant reaching into the backpack were not objectively reasonable because they were unrelated to whether defendant was a threat. The only action that was related to whether defendant was a threat, defendant argued, was defendant's single furtive movement, reaching into the backpack, which was insufficient to prove that safety concerns were objectively reasonable.

The state responded that defendant's actions prior to reaching into the backpack contributed to officer safety concerns, which, under the totality of the circumstances, provided officers objectively reasonable suspicion that defendant was an immediate threat. The state added that Harmon gave defendant permission to place the phone in his backpack, not to reach deeply into it. Because Harmon had objectively reasonable safety concerns, the state argued, officers lawfully handcuffed defendant and discovered the resulting evidence.

         The trial court agreed with the state, and it denied the motion:

    "And I don't have to repeat all the circumstances, but all these steps of causing the police higher and higher and higher anxiety about what they're dealing with. They were concerned they weren't dealing just with a jaywalking case. The furtive movements, the wouldn't look at the police in the eye, and then, of course, the reasonable suspicion that they had that he was not giving them the correct name. And then when he asked to put the phone in the bag and then put his hand in such a way that he could be grabbing a weapon, they—I believe they had a right to grab his arm and thereby they found the weapon. Both objectively and subjectively, I believe that was reasonable."

         Defendant entered a conditional guilty plea, reserving the right to seek appellate review of the trial court's denial of his motion to suppress. The trial court entered a judgment of conviction on all counts, and this appeal followed. As to the officer safety seizure, the state argues on appeal that the following four facts created subjective safety concerns for the officers: "(1) [defendant] reached his entire hand and forearm into the backpack; (2) he kept his eyes on Officer Harmon to see if he was watching; (3) he previously had tried to walk away from the stop; and (4) he refused to give officers his name and then gave them a fake name." According to the state, those subjective facts create an objectively reasonable concern for safety because "the officers did not know who they were dealing with at this moment" and that during an encounter where defendant had been evasive about answering questions, "defendant was reaching deep into his backpack while keeping his eyes fixed on a police officer." As the state argues, that makes it "objectively reasonable to suspect that defendant was reaching into the bag to pull out a dangerous item." We turn now to the merits.

         Article I, section 9, protects the right of Oregonians "to be secure in their persons *** against unreasonable search, or seizure[.]" In *State v. Bates*, 304 Or 519, 524, 747 P2d 991 (1987), the Supreme Court held:

    "Article I, section 9, of the Oregon Constitution, does not forbid an officer to take reasonable steps to protect himself or others if, during the course of a lawful encounter with a

citizen, the officer develops a reasonable suspicion, based upon specific and articulable facts, that the citizen might pose an immediate threat of serious physical injury to the officer or to others then present."

As an overview, under the officer-safety doctrine, the state bears a two-part burden of proof and persuasion. First, the state must prove the subjective component of officer safety. For that, the state bears the burden of establishing that: (1) based on specific and articulable facts known to the officer, the officer (2) had subjective reasonable suspicion, that (3) the defendant posed an immediate threat, and (4) the threat was of serious physical injury. *State v. Hendricks*, 213 Or App 360, 364, 160 P3d 1014, *rev den*, 343 Or 467 (2007). Once the state has met its burden on the subjective component, it then bears the burden to prove that, under the totality of the circumstances, (1) the officer's subjective safety concerns of an immediate threat of serious physical injury were objectively reasonable, and that (2) the officer's response to the safety concerns was, itself, objectively reasonable. We now discuss each of those components in more detail.

First, the officer's subjective safety concerns must be based on specific and articulable facts, not on "intuition or a generalized fear that the person may pose a threat to the officer's safety." *State v. Smith*, 277 Or App 298, 303, 373 P3d 1089, *rev den*, 360 Or 401 (2016) (internal quotation marks omitted). "[T]he officer's safety concerns must be based on facts specific to the particular person searched." *State v. Jackson*, 190 Or App 194, 198, 78 P3d 584 (2003), *rev den*, 337 Or 182 (2004). An officer may not interfere with a person's liberty based on only intuition or a hunch. *State v. Walker*, 277 Or App 397, 401, 372 P3d 540, *rev den*, 360 Or 423 (2016).

Second, the subjective concerns about the officer's safety must be from a threat that is immediate. Speculative concerns, or potential future dangers, will not suffice. Similarly, general concerns for safety, or concerns based on a general type of police-citizen encounter do not meet the requirement. *See, e.g.*, *State v. Moreno*, 150 Or App 306, 310, 946 P2d 317 (1997) ("In this case, the officers' testimony does

not support the conclusion that defendant posed an *immediate threat* to their safety. At best, the evidence shows that the officers had a generalized concern for their safety that would be present any time an officer approaches a citizen and begins questioning the person." (Emphasis in original.)).

Third, the officer safety doctrine does not reach to all perceived risks or dangers. Rather, to justify the warrantless seizure of a citizen, the subjective concern for safety must rise to the level of a concern for serious physical injury. Serious physical injury is defined by ORS 161.015(7) as "physical injury which creates a substantial risk of death or which causes serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ."

In determining whether an officer's concern for safety is objectively reasonable we consider "the totality of the circumstances as they reasonably appeared to the officer[] at the time * * *." *Jackson*, 190 Or App at 199. In our decisions involving the officer safety doctrine, we have acknowledged the realities of policing—that police-citizen encounters can sometimes involve split-second, highly-consequential decisions. *State v. Amell*, 230 Or App 336, 340, 215 P3d 910 (2009). Those points of decision are faced by the officer and the citizen both, and the safety of each can be affected. A court's task, in evaluating warrantless searches and seizures of citizens by the police under a claim of officer safety, is to evaluate the totality of the circumstances in which those decisions were made.

The "concept of reasonableness in this context is not biased in favor of the concerns of the police." *State v. Rudder*, 347 Or 14, 23, 217 P3d 1064 (2009). Accordingly, evaluating an officer's safety concerns against the rubric of objective reasonableness necessitates that a court look beyond the subjective perspective of the officer. What makes an officer's subjective safety concern objectively reasonable isn't that the officer thought it was reasonable, or even that the officer's subjective concern is supported by some evidence. Subjective officer safety concerns, even when supported by evidence in the record, cannot be given "greater weight than the constitutional right of all persons." *Id*. Rather, the concern must

be reasonable more broadly, to a standard society views as objectively reasonable. *State v. Davis*, 282 Or App 660, 667, 385 P3d 1253 (2016) ("Any officer-safety analysis must balance two interests: the individual's constitutional right to security in his or her person and an officer's right to take reasonable safety measures."); *State v. Zumbrum*, 221 Or App 362, 367, 189 P3d 1235 (2008) (explaining that, beyond the officer's subjective belief, our inquiry into objective "'reasonableness' requires consideration of the nature and extent of the perceived danger and the degree of intrusion resulting from the officer's conduct" (citing *State v. Rickard*, 150 Or App 517, 526, 947 P2d 215, *rev den*, 326 Or 234 (1997))).

To consider the true totality of the circumstances, therefore, requires a court to consider the entire encounter as it objectively transpired. Thus, in an evaluation of objective reasonableness we consider, in equal measure, the realities of policing, as well as the realities of *being policed. See Rudder*, 347 Or at 23 (describing the balance between officer safety concerns and "the constitutional right of persons— even those who have been stopped on suspicion of criminal activity—to be free of unreasonable searches and seizures"); *Davis*, 282 Or App at 667 (recognizing that "[a]ny officer-safety analysis must balance two interests: the individual's constitutional right to security in his or her person and an officer's right to take reasonable safety measures"); *see also Zumbrum*, 221 Or App at 369 (explaining that "there are several facts that detract from a reasonable belief that defendant's nervousness indicated the possibility of a physical danger," including that defendant was awakened in his mother's home by an officer who asked him to leave the room, that defendant complied, and then "immediately encountered another officer, who was not only physically imposing, but who also carried a sidearm"; "we consider those circumstances as part of the overall circumstances in determining the reasonableness of the officer's belief").

Finally, even when the state has proven all the elements discussed, "there are limits to what officers can do under the justification of protecting their safety." *State v. Miears*, 166 Or App 228, 235, 999 P2d 493, *rev den*, 331 Or 192 (2000). In addition to the requirement that the state

establish that the officer's safety concern was objectively reasonable, the state must also establish that the officer's response was also objectively reasonable. *State v. Rodriguez-Perez*, 262 Or App 206, 212, 325 P3d 39 (2014) ("[T]he steps the officer took to protect the officer or others must have been reasonable.") Objective reasonableness of the officer response is gauged by looking at the proportionality. The "officer safety doctrine does not excuse protective measures that are disproportionate to any threat that the officers reasonably perceive." *Rudder*, 347 Or at 23. An objectively reasonable response need not always be the least intrusive response. Rather, under the totality of circumstances, "a range of choices" may be objectively reasonable. *Id*.

We turn now to the application of those principles to the facts of this encounter. Again, on appeal the state relies on four facts: "(1) [defendant] reached his entire hand and forearm into the backpack; (2) he kept his eyes on Officer Harmon to see if he was watching; (3) he previously had tried to walk away from the stop; and (4) he refused to give officers his name and then gave them a fake name." We address those facts in reverse order.

That defendant had previously tried to walk away from the initial stop is a proper consideration, but, like all facts, it must be viewed in the totality of the circumstances of the entire encounter. That totality includes the fact that, at the time the seizure based on officer safety concerns occurred, defendant *had* stopped, was sitting on the curb, and was described as being fully cooperative. The officer testified that at that moment, defendant "was being cooperative. He wasn't running."

As for defendant's refusal to provide his name, we agree with the state that in the context of this encounter, that fact contributes to an objective assessment of a safety concern. We note, however, that on appeal the state advances a broader argument—that objective safety concerns arise whenever an officer doesn't "know who they [are] dealing with at [the] moment." We reject that broad argument because, as a general matter, an individual is typically under no legal obligation to provide a police officer with their name. Here, however, it is apparent that the officers were in the process

of attempting to issue defendant a citation. Furnishing a false name to a police officer is unlawful in the limited context of when the officer "is issuing or serving the person a citation under authority of ORS 133.055 (Criminal citation) to 133.076 (Failure to appear on criminal citation) or ORS chapter 153; or *** [t]here is an outstanding warrant for the person's arrest." ORS 162.385(1). Defendant's unwillingness to provide a name to the officers in such an instance adds to the objective reasonableness of the safety concerns under a totality of the circumstances. However, under the totality of the circumstances in this case, we must also recognize that at the time the officer grabbed defendant's arm, the officers had determined his true name—evidenced by the fact that they called him by his name while grabbing him.

We now turn to the remaining two facts on which the state relies, that defendant "kept his eyes on Officer Harmon to see if he was watching" and the manner in which defendant reached into the backpack. We agree that this record shows that Harmon formed a subjective safety concern based, in part, on the fact that, as Harmon testified, "[defendant] looked up at me as if to see if I was—I'm watching him." However, the state has provided little on this record to transform that subjective concern into objective reasonableness.

The officers testified that one of the things that caught their attention and increased suspicion at the outset of the encounter was that defendant *did not* look at them. Then, further into the encounter the state relies on the exact opposite behavior—that defendant *did* look at the officer—as creating a safety concern. But the state proffered no evidence, nor advanced any arguments, distinguishing between the two acts. We cannot conclude that such behavior intrinsically creates a reasonable concern for safety. We do not foreclose the possibility that a record could be developed in a specific case which supported the conclusion that looking at an officer in one point of an encounter created a safety concern and not looking created that concern at another point. But it is incumbent on the state to carry its burden and create a sufficient record in support of that conclusion.

Additionally, citizens, like police, can have subjective safety concerns during a police-citizen encounter. It is wholly unsurprising that a citizen, being detained by a police officer, who has just asked permission to perform an action, would watch the officer while performing that action. Even if defendant's gaze caused the officer concern, we do not see how such behavior is distinguishable from nervousness, which we have held insufficient to give rise to objectively reasonable safety concerns. *Zumbrum*, 221 Or App at 368-69 ("Although, under the circumstances, defendant's nervousness may have caused [the officer] concern, we cannot conclude that any particularized conduct by defendant suggested that he presented an immediate threat of serious physical injury.").

Considering defendant's reach into the backpack, Harmon emphasized that, "it was, ultimately, the manner in which [defendant] reached into the bag that was concerning." As we have frequently explained, a "suspect's furtive movements and nervousness, without more, do not support an inference of likely violence." *State v. Nye*, 295 Or App 559, 564, 435 P3d 805 (2019); *Davis*, 282 Or App at 668, (rejecting asserted officer safety justification because, "[a]lthough defendant's initial movement toward the floorboard of his truck may have raised [the officer's] subjective suspicion, it was not accompanied by other conduct that would give rise to an objectively reasonable concern for safety"); *Amell*, 230 Or App at 345 (concluding pat-down not justified on officer safety grounds where, despite the defendant's lie about whether his license was suspended and despite the officer's observation of a "digging movement" by the defendant— which the officer believed to be consistent with retrieving a weapon—the "defendant was cooperative at all times, did not show hostility, and made no suspicious movements during his interaction with the police").

We cannot separate defendant's movement from the context in which it was performed. The totality of the circumstances here includes the fact that defendant asked for, and was given, permission to perform the very act relied upon by the state. The officer could have qualified his permission or denied it outright but did not. Defendant's request for

permission evidences that defendant was respectful of the officer's safety concerns and behaving in a manner that reasonably would deescalate, rather an elevate, those concerns. While we are mindful of not "uncharitably second-guess[ing] an officer's judgment," *Bates*, 304 Or at 524, we likewise do not permit officers to create the very exigencies they then rely upon to diminish a citizen's Article I, section 9 rights. *State v. Roberts*, 75 Or App 292, 296, 706 P2d 564 (1985) ("Police officers cannot create their own exigencies.").

Harmon did testify that he believed that defendant putting the phone in the bottom of the backpack was "odd," and how he would not have done the same act. Harmon found it suspicious that defendant did not place the phone in an "outer pocket" or in the pocket of "the clothing he was wearing." Like the testimony regarding defendant watching Harmon, the state has given us nothing on this record to determine that Harmon's subjective belief was objectively reasonable. As a general proposition, we cannot conclude that it is unreasonable that a person may want to secure a valuable item like a phone in a protected area of a backpack as opposed to an outer area where the item could fall out. Again, we do not foreclose the possibility that an officer's belief in this area could be shown to be objectively reasonable, but it requires the development of a record greater than what exists here. On this record, we simply have Harmon's subjective concern.

Although we have addressed each point relied upon by the state above, we do not consider them in isolation. A totality of the circumstances approach does not lend itself to divide and conquer tactics. *See, e.g.*, *United States v. Door*, 647 Fed Appx 755, 756 (9th Cir 2016), *as amended on denial of reh'g and reh'g en banc*, 668 Fed Appx 784 (9th Cir 2016) (noting that a totality test precludes a "divide-and-conquer analysis"); *State v. Sharp*, 305 Kan 1076, 1081, 390 P3d 542 (2017) ("The totality of the circumstances standard precludes a divide-and-conquer analysis under which factors that are readily susceptible to an innocent explanation are entitled to no weight."). Rather, we consider the weight to be given to each fact, then evaluate the facts in the totality, recognizing that multiple facts may "combine to form a

whole greater than the sum of its parts." *State v. Radtke*, 272 Or App 702, 708, 358 P3d 1003 (2015).

Here, the totality of the circumstances must reflect that throughout the encounter defendant was nonthreatening. Even his initial refusal to stop was based on a disagreement over the law, which ultimately led to a civil *discussion* with the officer, not a *confrontation*. At the time of the seizure of defendant's arm, the officer described defendant as "cooperative." He was sitting on the curb after first asking permission to do so, and then, again, requested permission in advance to access his backpack. We have repeatedly held that when a defendant is cooperative, "in the absence of any threatening behavior by the defendant, generalized safety concerns *** are insufficient to justify an officer-safety search." *Smith*, 277 Or App at 298; *see also State v. Senn*, 145 Or App 538, 545, 930 P2d 874 (1996) (no objective officer-safety concerns where defendant's demeanor throughout the encounter was "entirely cooperative, nonhostile, and nonthreatening"). We reach the same result here. On this record, we cannot conclude that the state met its burden in this case to establish that the officers' subjective safety concerns were objectively reasonable. Accordingly, the trial court erred in denying that portion of defendant's motion to suppress.

Next, we turn to the search of the backpack. At the outset, we note that on appeal defendant does not argue that the search of the backpack was derivative of the seizure of defendant's arm for officer safety concerns. To the contrary, defendant argues on appeal that any error as to the officer safety seizure only results in suppression of the "the knife and defendant's statements regarding it." We agree. The search of the backpack was made pursuant to defendant's arrest for furnishing false information, the basis for which, on this record, is independent of the officer safety seizure.

The trial court found that the officers searched the backpack lawfully under the search incident to arrest exception to the warrant requirement, which permits a search, incident to arrest, when "the search is necessary to protect the arresting officers, to prevent the destruction of evidence, or to discover evidence related to the crime for which the

defendant is under arrest." *State v. Newport*, 204 Or App 489, 493, 130 P3d 792 (2006).[1] The state argues that such a search was justified because the officer could lawfully either (1) search for dangerous weapons, or (2) search for evidence of the crime of arrest—giving false information to a police officer.[2]

Under Article I, section 9, warrantless searches are *per se* unreasonable unless falling within one of the few "specifically established and well-delineated exceptions" to the warrant requirement. *State v. Davis*, 295 Or 227, 237, 666 P2d 802 (1983). Warrant exceptions are just that—*exceptions*. The Oregon Constitution presumes that when the government invades the privacy interests of a citizen by a search of their person, their home, or their effects, that search will have been sanctioned, and its scope delineated, through the judicial oversight offered by the warrant process.

When a search or seizure occurs outside the warrant process envisioned by the constitution, "[t]he state has the burden of proving that circumstances existing at the time were sufficient to satisfy any exception to the warrant requirement." *State v. Baker*, 350 Or 641, 647, 260 P3d 476 (2011). When judging whether the state has met that burden, a court is guided by the purpose of, and justification for, that exception. "[T]he exceptions to the warrant requirement *** must be applied consistently with the purposes animating the exception. Put differently, the contours and scope of the particular exception are circumscribed by the justification for that exception." *State v. Fulmer*, 366 Or 224, 233-34, 460 P3d 486 (2020).

A warrantless search incident to arrest must be grounded on one or more of the following purposes: "(1) to protect a police officer's safety; (2) to prevent the destruction

---

[1] At trial, the state also relied upon an inventory policy. On appeal, the state has abandoned any argument that the backpack or other containers were opened in accord with a lawful inventory.

[2] ORS 162.385 provides that a person commits the crime of giving false information to a peace officer "in connection with a citation or warrant if the person knowingly uses or gives a false or fictitious name, address or date of birth to any peace officer when: (a) The peace officer is issuing or serving the person a citation ***."

of evidence; or (3) to discover evidence of the crime of arrest." *State v. Mazzola*, 356 Or 804, 811, 345 P3d 424 (2015). As we have noted, a search incident to arrest under the first two purposes—officer safety and destruction of evidence— can become untethered from the animating purpose for the warrant exception when it occurs in a time, or a space, separated from the suspect's immediate control:

> "[I]n many circumstances, searches incident to arrest for those two reasons will be justified only when the area searched is still within the defendant's control, so that the defendant would be able to obtain a weapon stashed in the area or to destroy or conceal evidence located there. *See State v. Groom*, 249 Or App 118, 122, 274 P3d 876, *rev den*, 352 Or 665 (2012) (describing the first two bases for search incident to arrest as justified by the need 'to protect the arresting officer in case the suspect has a weapon within reach and to prevent the suspect from reaching and destroying evidence')."

*State v. Krause*, 281 Or App 143, 146, 383 P3d 307 (2016), *rev den*, 360 Or 752 (2017).

As for the third purpose for the exception—discovery of evidence of the crime of arrest—we have held that purpose undiminished when a defendant is separated from the object of the search. *Krause*, 281 Or App at 146-47 ("[A] search for that purpose may be justified even if the defendant has been removed from the area in which an officer believes that evidence may be located."). However, other limitations circumscribe the boundaries of the purpose. In *State v. Owens*, 302 Or 196, 199, 729 P2d 524 (1986), the Oregon Supreme Court held that a warrantless search incident to arrest for evidence of the crime of arrest was constrained by three factors: (1) the crime of arrest, (2) the nature of the evidence establishing that crime, and (3) whether the location searched could reasonably be understood to conceal such evidence.

> "Under Article I, section 9, a search incident to arrest for crime evidence is limited to a search for evidence of the crime for which the arrestee is arrested. In order to justify a search, incidental to an arrest, the arrest must be for a crime, evidence of which reasonably could be concealed on the arrestee's person or in the belongings in his or her

immediate possession at the time of the arrest. Thus, for example, if the person is arrested for a crime which ordinarily has neither instrumentalities nor fruits which could reasonably be concealed on the arrestee's person or in the belongings in his or her immediate possession, no warrantless search for evidence of that crime would be authorized as incident to that arrest."

*Id.* at 200; *see also State v. Washington*, 265 Or App 532, 537, 335 P3d 877 (2014) ("[O]fficers may open a closed container in conducting a search incident to arrest if evidence of the crime of arrest reasonably could be concealed in that container.").

Thus, a search incident to arrest for evidence of the crime of arrest is limited to *that* crime, and evidence of *that* crime. The exception does not permit an investigation into other potential crimes, or otherwise "justify an 'exploratory seizure' of 'everything in [the arrestee's] immediate possession and control upon the prospect that upon further investigation some of it might prove to have been stolen or to be contraband[.]'" *Owens*, 302 Or at 204-05 (internal citation omitted; brackets in *Owens*).

Finally, under any of the three justifications—officer safety, destruction of evidence, and evidence of the crime of arrest—the search "for evidence related to the crime for which the defendant was arrested, *** must be reasonable in time, scope, and intensity." *State v. Hartley*, 96 Or App 722, 725, 773 P2d 1356, *rev den*, 308 Or 331 (1989). A search is reasonable in time if it "occur[s] immediately after [a] defendant's arrest." *State v. Burgholzer*, 185 Or App 254, 259, 59 P3d 582 (2002). A search is reasonable in scope and intensity if it is "sufficiently close in space to the arrest," *State v. Vaughn*, 92 Or App 73, 78, 757 P2d 441, *rev den*, 306 Or 661 (1988), and extends into areas where the "instrumentalities" or "fruits" of the crime could *reasonably* be concealed, not just could *possibly* be concealed. *State v. Hite*, 198 Or App 1, 8, 107 P3d 677 (2005) (quoting *Owens*, 302 Or at 200).

We now apply those principles to this case. Here, the state relies, in part, on the officer safety purpose of the search incident to arrest warrant exception. At least for the

officer safety purpose, the exception is inapplicable under these facts. The record shows that at the time the backpack was searched, defendant had been arrested, was in handcuffs, and was separated from the backpack. The backpack, and its contents, had been reduced to the exclusive control of the officers. Whatever safety concerns might have existed had defendant had access to the backpack were neutralized through separation. Accordingly, that purpose of the search incident to arrest exception cannot justify the search here.

Alternatively, the state justifies the search on the grounds that the officer was searching for defendant's identification as evidence of the crime of arrest. At the outset, defendant disputes that the officer was, in fact, searching for evidence of the crime of arrest. Defendant is correct that there is testimony by Cerda in the record that he searched defendant's backpack not for evidence of the crime of arrest, but to search for additional weapons. However, in later testimony, Cerda stated:

"[PROSECUTOR]:   When and where did you look for ID of the Defendant?

"[CERDA]:   On his person and in the backpack.

"[PROSECUTOR]:   Did you find ID on the Defendant's person?

"[CERDA]:   No.

"[PROSECUTOR]:   So you say you were looking in the backpack for ID?

"[CERDA]:   Yeah, I guess if you phrase it that way. Yes.

"* * * * *

"[PROSECUTOR]:   Where in the backpack did you look for ID of the Defendant?

"[CERDA]:   Inside the—all the components and in the contents of the backpack.

"* * * * *

"[PROSECUTOR]:   Well, what, if any, containers then were inside the black nylon bag that you wanted to look— that you looked inside to try to find ID?

"[CERDA]:   There was an Altoids can inside the nylon bag."

In addition to whatever other motivations for the search might have existed, the record shows that a search for evidence of the crime of giving false information to a police officer was one of Cerda's reasons. Accordingly, we therefore look to whether defendant's identification was evidence of the crime of arrest, and further, whether the location searched (the Altoids tin) could reasonably conceal such evidence.

As a general matter, for many crimes of arrest, a search incident to arrest for identification of a suspect may be insufficiently connected to the exception's purpose. Identification is not an instrumentality or fruit of all crimes of arrest. In fact, the only situation where we have upheld the search incident to arrest for identification, as evidence of the crime of arrest, is in the context of providing a false name to a police officer—the crime for which the officer arrested defendant in this case. In *State v. Fesler*, 68 Or App 609, 613, 685 P2d 1014, *rev den*, 297 Or 547 (1984), we reasoned:

> "Defendant gave the officer a false name and persisted in that falsehood until confronted with the results of a collateral investigation. The officer had probable cause to arrest defendant and charge him with driving while suspended and giving a false name. That he had probable cause to charge defendant does not prevent further investigation. *** [I]t was reasonable to search for defendant's wallet and the identification it could be expected to contain. Such a search would relate to the offense for which defendant was arrested in two ways: it would further serve to identify defendant and, because defendant's knowledge he was suspended may be a pertinent consideration in such cases, it would further tend to show defendant's consciousness of guilt if the wallet had been hidden."

(Internal citation omitted.); *see also State v. Gordon*, 110 Or App 242, 246, 821 P2d 442 (1991) ("Evidence of defendant's identity was relevant to the crime of giving false information to an officer. Accordingly, the search of defendant's vehicle for evidence of identification was proper as a search incident to arrest.").

That does not end the inquiry, however. Even though defendant's identification was evidence of his crime of arrest here, the state still must establish that the search was reasonable in time, scope, and intensity. Specifically, the state bears the burden to establish that it was "reasonable" to conclude that the evidence sought—identification—could be concealed in the location searched—the Altoids tin. *Owens*, 302 Or at 200. We conclude that, based on this record, the state met its burden in this case.

The officer described the specific Altoids tin at issue as "being about the size of a 3 by 5 index card." Further, the officer testified that he had found identification in such containers in the past:

"[PROSECUTOR]: Over the course of your training and experience, have you had occasion to look inside other Altoids tins or other containers the size and shape of an Altoids tin?

"[CERDA]: Yes.

"[PROSECUTOR]: And over the course of your career in looking in such containers, have you found valuables in those containers before?

"[CERDA]: Yes.

"[PROSECUTOR]: What kind of valuables have you found in Altoids tins or other type containers?

"[CERDA]: Jewelry that's been found in those types of containers, cash, change, identification, it's probably the majority of things that are found."

The trial court credited the officer's testimony on this point, and we are bound to accept such factual determinations when the record supports them. *Leiby*, 293 Or App at 294. Accordingly, on the facts of this record, we conclude that the state met its burden to show that (1) the officer searched the Altoids tin for defendant's identification, (2) identification was evidence of the crime of arrest—providing false information to a police officer, and (3) it was reasonable to conclude that such evidence could be concealed within the Altoids tin. The purpose and justification for the search incident to arrest exception to the warrant requirement being served, and the search being reasonable in time,

scope, and intensity, the trial court did not err in denying the motion to suppress the contents of the backpack.

Lastly, we discuss our disposition, which is dictated by ORS 135.335(3). In *State v. Tannehill*, 341 Or 205, 207, 141 P3d 584 (2006), the state charged defendant with three counts of third-degree sexual abuse and one count of witness tampering. Defendant filed an unsuccessful motion to dismiss the three sexual abuse counts then entered a conditional guilty plea, pursuant to ORS 135.335(3), to one count of third-degree sexual abuse and one count of witness tampering. *Id*. at 207-08. On appeal, the Supreme Court agreed with the defendant's argument as to the statute of limitations and then addressed the proper disposition in light of the defendant's conditional guilty plea. *Id*. at 208-10. The court held that the defendant was entitled under ORS 135.335(3), if he so chose, to withdraw "the entire plea rather than only part of it." *Id*. at 210-11. Accordingly, rather than reversing and remanding only with respect to the conviction for third-degree sexual abuse and affirming the conviction for witness tampering, the Supreme Court remanded the entire case to the circuit court "for further proceedings."

We have subsequently applied the same disposition as in *Tannehill* in cases where "the conditional plea was an integrated whole" such that the plea petition "did not purport to differentiate between [multiple] charges" or condition the plea as to "the ultimate appellate outcome with respect to the suppression of evidence relating only to [a] charge." *State v. Cruz-Renteria*, 250 Or App 585, 588, 280 P3d 1065 (2012). Such is the case here. Accordingly, the proper disposition is to reverse and remand for further proceedings. At that time, defendant may elect to withdraw his plea as to the charge of carrying a concealed weapon or may elect to withdraw his plea in its entirety.

Reversed and remanded.