Argued and submitted May 3, 2021, reversed and remanded February 24, 2022

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JONATHAN DAVIS GILKEY,
*Defendant-Appellant.*

Multnomah County Circuit Court
18CR84967; A172264

505 P3d 1029

Defendant appeals a judgment of conviction for felon in possession of a firearm and the unlawful possession of heroin. He asserts that the trial court erred in admitting evidence that was obtained by an unlawful extension of a stop, which included questions about his incarceration history based on the appearance of his tattoos. The state responds that this was a permissible inquiry under the officer-safety exception to the warrant requirement. *Held*: Under the requirements of *State v. Jimenez*, 357 Or 417, 353 P3d 1227 (2015), the state failed to show that the questions about incarceration based on defendant's appearance were objectively reasonable to address a circumstance-specific threat to the officer's safety. Furthermore, the state failed to prove that the evidence discovered was attenuated from the illegality. Accordingly, the trial court erred by denying the motion to suppress.

Reversed and remanded.

Angel Lopez, Judge.

Eric Johansen, Deputy Public Defender, argued the cause for appellant. Also on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

David B. Thompson, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before James, Presiding Judge, and Lagesen, Chief Judge, and Kamins, Judge.

JAMES, P. J.

Reversed and remanded.

## JAMES, P. J.

Defendant appeals from a judgment of conviction for one count of felon in possession of a firearm, ORS 166.270(1), and unlawful possession of heroin, ORS 475.854(2)(b). A deputy sheriff stopped defendant for a traffic violation and developed reasonable suspicion that defendant had stolen the vehicle he was driving. During the encounter, the deputy observed tattoos on defendant that he thought might be indicative of defendant having been in prison. Based on those tattoos, the deputy delayed his investigation and instead asked defendant questions about his incarceration history, as an indirect means to assess the risk that he might be armed. The deputy never asked defendant directly whether he had any weapons. Based on the totality of circumstances, which included defendant's acknowledgment that he had been incarcerated, the deputy ordered defendant to submit to a patdown. He found a weapon and controlled substances as a result.

Defendant moved to suppress the evidence. He argues that the deputy unlawfully extended the encounter by questioning him about his incarceration history, which was unrelated to the stolen vehicle investigation. In response, the state argues, in accord with the trial court's reasoning, that the question about incarceration was justified under the officer-safety exception to the warrant requirement. The state does not dispute that the question extended the stop, in a constitutional sense. And because, as previously noted, the deputy never directly asked defendant whether he had any weapons, we are not called upon to determine whether the deputy could have made a direct weapons inquiry. Instead, as framed by the parties, the only issue before us is whether asking defendant about his incarceration history was justified under the officer-safety exception.

So framed, this case presents a nuance on the weapons inquiry issue in *State v. Miller*, 363 Or 374, 388-89, 422 P3d 240, *adh'd to as modified on recons*, 363 Or 742, 428 P3d 899 (2018) (internal citations omitted). There, the Oregon Supreme Court held that

"[t]he issue we resolve is whether the officer's single question about a firearm unlawfully extended the stop. Unlike

conducting a *search* for weapons during a lawful stop, which must be justified by reasonable suspicion that the citizen 'might pose an immediate threat of serious physical injury' and must be based on factors particular to the detained person, asking a *question* that is reasonably related to and reasonably necessary to effectuate a lawful investigative stop requires no independent constitutional basis and no circumstances particular to the detained person. \*\*\* On this record, we accept the trial court's implicit finding that the officer subjectively perceived a danger from the circumstances attendant to a roadside DUII investigation and decided that an inquiry about weapons was necessary to address that danger. We also conclude that the officer's question was reasonably related to and reasonably necessary to effectuate his DUII investigation because we conclude that he 'perceived a circumstance-specific danger' that necessitated the question about weapons and that his 'perception and decision [to ask about weapons] were objectively reasonable.'"

(Emphases in original.)

In this case, as we will discuss, there is no dispute that the officer had a reasonable perceived safety concern. The issue is whether his question—which was not the weapons inquiry of *Miller*, but something more tangential—was "reasonably related" to that perceived safety concern. On this record, we conclude that it was not. Under the totality of the circumstances, the officer did not have an objectively reasonable basis as required by Article I, section 9, of the Oregon Constitution to ask defendant questions about his incarceration history. Because that is the only issue before us—the state does not dispute that the stop was extended if that is the case—we reverse and remand.

We review a trial court's denial of a motion to suppress for legal error, and we are bound by the trial court's findings of historical fact as long as there is constitutionally sufficient evidence in the record to support those findings. *State v. Ehly*, 317 Or 66, 74-75, 854 P2d 421 (1993). To the extent that the trial court failed to make express findings on pertinent historical facts, we will presume that the court found those facts in a manner consistent with its ultimate conclusion. *State v. Maciel-Figueroa*, 361 Or 163, 165-66, 389 P3d 1121 (2017).

The following facts are taken from the Deputy Farmer's testimony that the trial court found credible at the hearing on defendant's motion to suppress. On December 22, 2018, Farmer was on routine patrol in a residential area during the daytime hours and noticed an older model vehicle driven by defendant. He described the vehicle as having "very prominent damage" to the passenger side and damage to the front windshield. Farmer had previously come across stolen vehicles in the area, and it was his practice to check the license plates of older sedans against a DMV database to determine if they matched the vehicle. The results indicated that the plates on defendant's vehicle were for a different make of car. Farmer followed defendant's vehicle to an area where multiple stolen vehicles had been recovered, and he observed defendant attempt to make a "rapid U-turn" in a cul-de-sac. At that point, Farmer initiated a traffic stop for the incorrect plates, which is a violation under ORS 803.550(3)(a).

Farmer testified that the incorrect plates and the circumstances of the stop led him to develop reasonable suspicion that the vehicle was stolen; defendant does not contend on appeal that Farmer lacked reasonable suspicion. To determine whether or not the vehicle was stolen, the deputy needed to ascertain the vehicle's identification number or "VIN." When Farmer spoke to defendant, he responded that he had no proof of insurance or registration because the car belonged to his friend. Defendant identified himself with an out-of-state identification card. Farmer recognized this as a common response from suspects in previous stolen vehicle investigations. Furthermore, Farmer observed that defendant had "prominent tattooing" on his body. Based on Farmer's experience, he interpreted this as "potentially prison tattooing" and inquired about defendant's incarceration history. Defendant responded that he had been incarcerated.

"[DEPUTY FARMER:] So I'm speaking to Mr. Gilkey about this. I also noticed he had prominent tattooing, which, you know, is nothing prejudicial, but based on the appearance of the tattoos, my prior experience as a correctional officer, it looked as though it was potentially prison tattooing. And I know that incarcerated males with

extensive tattooing who have been in the prison system are commonly associated with criminal gangs, which can be very violent, and a lot of those members outside of prison tend to carry weapons. So I had asked him about that, just because I noticed it and observed it.

"[PROSECUTOR:]   What did you specifically say or ask him if you remember?

"[DEPUTY FARMER:]   I asked him if he'd ever been incarcerated, and Mr. Gilkey told me that he had, but said he hadn't done prison time, which we later found was false.

"[PROSECUTOR:]   Okay. So what do you do next?

"[DEPUTY FARMER:]   So based on the totality of everything, I had requested a cover deputy, which ended up being Deputy Delatorre who arrived shortly thereafter."

Farmer did not testify that he ever asked defendant if he possessed any weapons. While the deputy waited for cover, defendant was seated in the vehicle's driver seat with his hands visible, the ignition had been turned off, and the keys handed over at Farmer's request.

When the cover deputy arrived, Farmer instructed defendant that he needed to check the car's VIN.[1] However, Farmer did not simply order defendant to exit the vehicle and stand with the cover officer while he checked the VIN; instead, as Farmer explained, based in part on the tattoos and incarceration history, he asked defendant to assume a position against the vehicle and submit to a patdown search:

"So I told Mr. Gilkey what I wanted to do to be able to facilitate [checking the VIN] was have him step out of the vehicle. I also told him, and this I didn't tell him necessarily why, but in my own mind all these justifications I just mentioned, I told him I'd like to be able to pat him down for weapons, make sure that he wasn't holding any of those."

---

[1] At the motion to suppress hearing, the deputy was questioned about when and how he read the VIN numbers that were integral to his stolen vehicle investigation. When asked if the damage to the windshield affected his ability to read the VIN, the deputy could not recall. The deputy testified that the VIN can be read in multiple locations on the vehicle, and the deputy's practice was to read both the dashboard VIN and the door VIN to ensure that they both matched the vehicle. The deputy did not attempt to read any VIN until defendant was out of the vehicle and under the control of the cover deputy.

Throughout this encounter, defendant was cooperative and acted normally. The deputies were standing on opposite sides of defendant. Defendant was asked to turn and place his hands on the car with his legs separated. Before he commenced the patdown, Farmer noticed a syringe in defendant's open pocket. The deputy asked defendant what was in his pocket, and he replied that it was "a rig." After some back and forth, defendant confirmed that it was a syringe that contained heroin. The deputy placed him under arrest for possession of a controlled substance, handcuffed him, and removed the syringe. At that point, defendant told the deputy that he would find a gun in his pocket. Defendant was *Mirandized* shortly thereafter and charged with possession of heroin and felon in possession of a firearm.

Article I, section 9, protects the rights of citizens "to be secure in their persons *** against unreasonable search, or seizure[.]" Warrantless seizures are *per se* unreasonable unless they fall within one of the well delineated exceptions to the warrant requirement. One of those exceptions, the investigatory-stop exception, permits the "brief detention of citizens under circumstances not justifying an arrest, for purposes of limited inquiry in the course of routine police investigations" as long as police have reasonable suspicion of a crime. *State v. Cloman*, 254 Or 1, 7-8, 456 P2d 67 (1969) (quoting *Wilson v. Porter*, 361 F2d 412, 414-15 (9th Cir 1966)). Investigatory stops are limited in duration and scope:

> "Whether an officer is investigating criminal or unlawful noncriminal activity, the officer's authority to stop an individual—based on reasonable suspicion of criminal activity or on probable cause of unlawful noncriminal activity—is founded on the assumption that temporary, investigative stops to investigate particular conduct are permitted for that particular purpose only. It therefore follows that limits apply to an officer's ability, during such a stop, to use that stop for other purposes."

*State v. Arreola-Botello*, 365 Or 695, 710, 451 P3d 939 (2019) (footnote omitted). In other words, "it is 'the justification for the stop' that 'delineates the lawful bounds of the traffic stop.'" *Id.* (quoting *State v. Watson*, 353 Or 768, 778-79, 305 P3d 94 (2013)). "Thus, when determining whether a stop that was reasonable at the outset has become unreasonable," we

"consider the totality of its circumstances," and the stop is "subject to both subject-matter and durational limitations." *Id.* at 711-12.

In this case, the state does not dispute that the deputy's questions about tattoos and incarceration extended the stop. Rather, the state argues that any temporal extension was lawful, as the inquiries were permissible under the officer-safety doctrine. In *State v. Bates*, 304 Or 519, 524, 747 P2d 991 (1987), the Supreme Court held:

> "Article I, section 9, of the Oregon Constitution does not forbid an officer to take reasonable steps to protect himself or others if, during the course of a lawful encounter with a citizen, the officer develops a reasonable suspicion, based upon specific and articulable facts, that the citizen might pose an immediate threat of serious physical injury to the officer or to others then present."

Under the officer-safety doctrine, the state bears a two-part burden of proof and persuasion. First, the state must prove the subjective component of officer safety, establishing that: (1) based on specific and articulable facts known to the officer, the officer (2) had subjective reasonable suspicion, that (3) the defendant posed an immediate threat, and (4) the threat was of serious physical injury. *State v. Hendricks*, 213 Or App 360, 364, 160 P3d 1014, *rev den*, 343 Or 467 (2007). If the state can meet its burden to establish the subjective component, it then bears the burden to prove that, under the totality of the circumstances, "(1) the officer's subjective safety concerns of an immediate threat of serious physical injury were objectively reasonable, and that (2) the officer's response to the safety concerns was, itself, objectively reasonable." *State v. Ramirez*, 305 Or App 195, 205, 468 P3d 1006 (2020).

This case requires us to focus on that final element: the objective reasonableness of an officer's response to a perceived safety concern, specifically, questioning a defendant. In *Jimenez*, the Supreme Court explained that "when an officer has seized an individual and has a constitutional basis to continue to temporarily detain and question him or her," the officer may ask questions that are "reasonably related to and reasonably necessary to effectuate" the officer's investigation. *State v. Jimenez*, 357 Or 417, 428-29, 353

P3d 1227 (2015). However, when the officer asks a question that is not reasonably related to the reason for the stop, the question extends the stop, and Article I, section 9, requires that there be an independent basis to justify the extension. *State v. Pichardo*, 360 Or 754, 762, 388 P3d 320 (2017).

The most straightforward inquiry is, of course, a weapons inquiry. An officer cannot justify his questions about weapons as a routine inquiry that ignores the circumstances of stop:

> "For a weapons inquiry conducted in the course of a traffic investigation to be reasonably related to that investigation and reasonably necessary to effectuate it, an officer must have reasonable, circumstance-specific concerns for the officer's safety or the safety of other persons who are present. To justify an officer's weapons inquiry, the officer's safety concerns need not arise from facts particular to the detained individual; they can arise from the totality of the circumstances that the officer faces. However, if the officer does not have at least a circumstance-specific safety concern, then the officer's weapons inquiry has no logical relationship to the traffic investigation. And, if the officer's circumstance-specific safety concerns are not reasonable, then an officer who acts on those concerns violates Article I, section 9, which protects the people from an 'unreasonable search, or seizure.'"

*Jimenez*, 357 Or at 429. In other words, for the state to establish that a question survives the *Jimenez* test, it must present evidence that (1) the officer perceived a circumstance-specific danger, and that perception was objectively reasonable, and (2) the officer decided that the questions asked were necessary to address that danger, and it is objectively reasonable that those questions would ameliorate or clarify the safety concern. *Id.* at 430. In *Jimenez*, the officer failed to demonstrate a circumstance-specific safety concern because he was in the practice of making a routine weapons inquiry for virtually every stop, and he did not testify that he had reasonable, circumstance-specific safety concerns for the stop in question. *Id.*

Applying those principles here, we begin by noting that at the time of the stop for the traffic violation, Farmer had observed damage to the vehicle, and it was in a vicinity

where other vehicles had been stolen. He also noticed defendant make rapid movements while he was driving. Farmer knew that he would need to verify the VIN to confirm that the vehicle was not reported stolen. Accordingly, in his training and experience, he knew he would have to ask defendant to step out of the car to safely check the VIN. He testified that in his experience "[i]f somebody has weapons or something concealed in [the car], it's very, very dangerous for us."

The state argues that the deputy's questions about tattoos and incarceration serve a purpose tantamount to asking about weapons: "Farmer asked about defendant's tattoos and incarceration history based on his knowledge that the kinds of tattoos he saw on defendant were associated with violent prison gangs, and that members of those gangs who were outside of prison tend to carry weapons." We disagree with that characterization of the deputy's testimony, and with the conclusions that the state draws from this record. The deputy did not testify that he saw tattoos that signified defendant's affiliation with a particular gang. Instead, the deputy recognized tattoos that *might* be associated with that "type" of group or what Farmer testified to as "potentially prison tattooing." Further, and critically, the deputy was focused, not on the specific tattoos, but on how many tattoos defendant had, testifying that he associated "extensive tattooing" with "criminal gangs." In short, the deputy associated extensive, "potential" tattooing with people who *might* be dangerous, and who *might* carry weapons outside of prison. In effect, the state asks us to speculate. We cannot. Article I, section 9, does not permit fishing expeditions under the guise of officer safety.

Ultimately, an officer's actions must connect the inquiry—here, the questions about incarceration and tattoos—to the officer's articulated perception of the circumstance-specific danger.[2] *Miller*, 363 Or at 385-86. In *Miller*, an officer had adequately explained the circumstances that caused him to be concerned for his safety. *Id.* at 385. The officer articulated the safety hazards of conducting

___

[2] On cross-examination, Farmer testified that, "I spoke to him about his tattoos and potential previous incarceration history." When specifically asked if he spoke with defendant about his tattoos, he responded, "I asked him if he'd ever been incarcerated."

a field sobriety test in the early hours of the morning. *Id.* In response, he asked a direct and simple weapons inquiry. He further described the reason why a weapons inquiry was necessary because of the hazard a weapon would pose during the DUII investigation. Furthermore, the *Miller* court found that the officer's question about a firearm addressed the circumstance-specific danger because it was asked before conducting the field sobriety tests.

In contrast to *Miller*, we fail to see how the deputy's inquiry here about incarceration was relevant to, ameliorated, or clarified, the perceived safety threat. The question about incarceration—built as it was upon assumptions about appearances, associations, and vague predilections of groups—did little, if anything, to establish whether defendant was armed. *Jimenez* explains that "[t]o demonstrate that an officer's weapons inquiry is reasonably related to a traffic investigation and reasonably necessary to effectuate it, the state must present evidence that * * * the officer's perception and decision were objectively reasonable." *Jimenez*, 357 Or at 430. We cannot conclude that standard was met on this record.

We recognize that police officers must have latitude in deciding how to protect themselves when confronted with the dangerous situations they frequently face. *State v. Payne*, 310 Or App 672, 684, 487 P3d 413 (2021). But those safety measures must be reasonable, and our determination of what is a reasonable officer-safety measure must be mindful of the realities that attend both to policing and being policed—in equal measure. *Ramirez*, 305 Or App at 207. Here, the circuitous, propensity-based inquiry about defendant's incarceration history was predicated on speculation about the appearance of defendant's tattoos. These questions did not address a circumstance-specific threat to officer safety, and they were not objectively reasonable. A question about weapons might have satisfied the test *Jimenez* requires, but the inquiry here did not.

Nor can we conclude that the evidence discovered was attenuated from the illegality. In its briefing, the state, in a single sentence, asserts that any evidence discovered is not "tainted" by any illegality. But beyond that single

utterance, the state develops no attenuation argument. When the state has obtained evidence following the violation of a defendant's rights under Article I, section 9, we presume "that the evidence was tainted by the violation and must be suppressed." *State v. Jackson*, 268 Or App 139, 151, 342 P3d 119 (2014) (citing *State v. Unger*, 356 Or 59, 84, 333 P3d 1009 (2014)). The state may rebut that presumption by proving that the police did not exploit the unlawful police conduct to obtain the challenged evidence—that is, that the unlawful police conduct was "independent of, or only tenuously related to" the disputed evidence—attenuation. *State v. Benning*, 273 Or App 183, 194, 359 P3d 357 (2015) (quoting *State v. Hall*, 339 Or 7, 35, 115 P3d 909 (2005)); *see, e.g.*, *Unger*, 356 Or at 84 (adhering to that requirement, as stated in *Hall*). It is suppression, not attenuation, that is the default operative position. The state bears the burden of proof and persuasion that "the violation of defendant's rights had such a tenuous factual link to the disputed evidence that the unlawful police conduct cannot be properly viewed as the source of that evidence." *Id*.

Here, the state has developed no argument that, if an illegality occurred, the subsequently derived evidence was attenuated. And, as we noted earlier, Farmer testified that he ordered defendant into the position against the car, which is where he then saw into defendant's pocket, based in part on defendant's tattoos and incarceration history. Having concluded that justification for the officer's questions was flawed, we necessarily conclude that the encounter was unlawfully extended under Article I, section 9, and that the evidence derived from that encounter is tainted and should be suppressed.

Reversed and remanded.